Spencer, Ch. J.
The questions arising on this appeal are, 1. Whether the arbitrators were legally chosen. 2. Whether, admitting them to have been so, they have been guilty of such misconduct as ought to call for setting aside their award. A third point has been argued, relative to the alleged misconduct of the respondents in concealing the decay of the works, and in adopting measures to deceive and mislead the arbitrators. I shall not discuss that point, because, in the view of the subject which I have taken, it is unnecessary ; and because I am not prepared to say that the respondents have been guilty jf any fraud in the particulars suggested.
Notwithstanding the ingenious distinctions made between an appraisement, under an agreement entered into many years before the appraisement takes place, and an ordinary submission to arbitration, I confess that I do not feel the force of those distinctions’. It makes no difference when the contract was made. It took its effect from the mutual agreement as to the persons to become the appraisers: and, by whatever name they were called, they were substantially arbitrators, with plenary power to decide upon the subject in difference between the parties. The objection to the choice of an umpire, if it were true, that the two persons first chosen had not differed in opinion, is equally untenable. It is well settled, that arbitrators may nominate #an umpire before they proceed to the consideration of the subject submitted, and it is the fairest way of choosing an umpire. (2 Term Rep. 645.)
If the arbitrators refuse to hear evidence pertinent and material to the matter in controversy, it is unquestionably such misconduct as will vitiate an award in a court of equity. Partiality and corruption, in either of the arbitrators, or the suppression and concealment of material facts, by either of the parties, if it can reasonably be supposed that the knowledge *323 of such facts by the arbitrators would have produced a different result, are causes for setting aside an award. There is also another cause for setting, aside an award, as exemplified bv the Butcher of Croydon’s case, for excessive damages. . (3 Ch. Rep. 76. 2 Vern. 251. 1 Eq. Cas. Abr. 59.) The butcher had been called a bankrupt knave, and the arbitrators gave him 495 pounds to repair his honor, and the Court of Chancery set aside the award. Upon this case I will merely remark, that I think it good law, if the damages were to be considered so enormous and exorbitant as to induce a conviction, that the arbitrators must have been corrupt or grossly partial. In the case of Spettigue v. Carpenter, (3 P. Wms. 362.) on a bill filed to set aside an award, it appeared there were several stated accounts between the parties, whereby considerable sums were due from the defendant; but the arbitrator, without any regard to the stated accounts, made up an account in his own way, making the plaintiff indebted 25 pounds, and awarded the former to assign to the latter, a mortgage which he had on his estate. The plaintiff, understanding what award was about to be made, sent a messenger to the arbitrator, a few days before the expiration of the time for making an award, that he desired him to defer making his award until he should talk to him about his demands, in support of the stated accounts, and know what objections were made to them ; the arbitrator would not defer making the award, and Lord Chancellor Talbot set it aside with costs, on the ground that the arbitrator acted unduly in making it, when the plaintiff had desired to be heard against the arbitrator’s determining, in contradiction to so many stated accounts. In Earle v. Stocker, (2 Vern. 251.) the case of *Pitt v. Dawkra is recognized, in which the arbitrators promised to hear witnesses, but made their award before they had done so, and it was set aside; and the case of Smith v. Corytbn is also referred to, where the arbitrator had promised not to make his award until Smith, who was unwell, should come abroad; and Lord Nottingham inclined, for that reason, to set it aside. In Walker v. Frobisher, (6 Ves. jun. 70.) the award was set aside because the arbitrator received evidence, after notice to the parties, that he would receive no more, and in which they acquiesced. In the case of Morgan v. Mather, (2 Ves. jun. 15.) Chief Justice Eyre, and Judges Ashhurst and Wilmqt, sitting as commissioners, recognize the principle, that for misbehavior in arbitrators the award will be set aside. Justice Wilmot said, that corruption in the arbitrators, or their proceeding contrary to the principles of natural justice, though there be no corruption, as if without reason they will not hear a witness, are good causes for setting aside an award. It is useless to multiply authorities on this point, as the principle cannot be controverted, that, for misbehavior in the arbitrators, in refusing to hear material testimony, an award will be set *324 aside in* equity. The principle is so fundamentally just, that it requires no adjudged cases to support it. How are the arbitrators tp do justice between the parties, if they refuse to avail themselves of the only means, the testimony of witnesses, to arrive at an honest and conscientious result? It is true, the arb'trators are judges of the parties’ choosing, and I would do nothing to discourage arbitrations. It is a cheap and peaceful method of settling disputes; but to uphold and maintain the awards of arbitrators, when they are guilty of such gross and scandalous misbehavior, as to refuse to hear material evidence, would, in my judgment, produce a universal dread of that mode of adjusting differences. Independently of what is due to individual justice, it would be an alarming doctrine, to hold that there can be no relief against an award, even if the arbitrators outrage every principle of justice in refusing to hear the proofs of one of the parties.
I agree to the proposition, that if arbitrators hear the evidence offered to them, and make up their award with such #lights as the parties afford them, their award, in estimating damages, or on the value of property, will not be set aside, unless their estimates are so enormously disproportioned to the case proved, as to strike every one that there must have been corruption or partiality.
After a rigid and strict examination of the case by the chancellor, he admits his impression to be from the proof, that the property has been considerably overvalued. In this I entirely concur with him, as I do, also, in the conclusion, that unless there be some well established fact, which will, on sound principles, justify us in setting aside the award, it must stand.
With respect to the proof offered to be adduced to the arbitrators by Van Wyck, the agent of Pierre Van Cortlandt, the chancellor, after commenting on the evidence, comes to the conclusion, that the only testimony he offered to produce was that relating to the original cost of the dam and raceway. This certainly was offered to be proved, and it is indisputably true, that the arbitrators refused to hear it.
The testimony of Theodoras C. Van fVyck, Samuel Mott, Nathan Anderson, and David Lydig, establish the point, that such evidence was offered in due season, and that the arbitrators declined, and refused to hear it. And it is apparent from the proofs in the cause, that the award was made up, without any evidence of any kind, as to the value of the erections, dr their cost, and merely on inspection and personal examination.
His honor the chancellor considered the proof offered of the original cost of the dam and raceway as delusive and injurious, on. the ground, “ that the cost of a dam and raceway, built twenty-one years before, could not be material as to their then existing value, and that there would be very little, if any, analogy between the original cost and the present value, considering the length of time which had intervened, and the great *325 variations in price, and labor, and business, and many other circumstances connected with such works.”
On this point, I am under the necessity of dissenting from the opinion of the chancellor. The evidence of the original cost of the dam and raceway would not only be admissible *and pertinent evidence, but, under all the circumstances, the only and the best evidence, to enable the arbitrators to ascertain the value of the works and erections as contemplated by the parties under the provisions in the lease.
The Van Cortlandts were proprietors of the land leased, and of the mill-seat; and after the expiration of the lease, it was to revert to them again as their property; during the term, the lessors were to be paid their rent, and on the termination of the lease, the mill or mills, and whatever might appertain thereto, were to be appraised or valued, the amount of which was to be paid by the lessors. The agreement between the parties is substantially this: that, inasmuch as the lessees intended to erect one or more mills, mill-dam and raceway, &c., at their own cost, and as they were to occupy them for a limited time, and they would revert to the lessors, as owners of the land, the lessees were to be indemnified, by an appraisement of the value of the works and erections, when they were surrendered. And what would be the value of them to the lessors ? Certainly nothing more than what it would cost them to construct the same works ; indeed, it would be less, for the deterioration by use ; and necessary and natural decay would form a subject for deduction from the cost.
One method of ascertaining the value would be the judgments of individuals experienced in the construction of mills and their necessary appendages; but, as was very justly observed on the argument, the estimate of the most skilful millwrights is not an accurate standard ; there are many circumstances which elude the most careful estimation; and it appears to me, that it would be impossible for men not practically conversant with building mills, and making mill-dams and raceways, to form an opinion of their cost, which would hot be entirely conjectural and imaginary; and I do not understand from the Case, that either of the appraisers was a practical millwright, or mechanic of any description.
What, then, could throw so much light on the then value of the subjects to be appraised, as evidence of what it originally cost to make them ? The lapse of time which had intervened, would render it necessary and just to make very considerable deductions from the first cost, in consequence of the decay of parts of the works. And if there are variations in the price of materials and labor, of which we have no evidence, surely nothing can be more easily proved; for the period of their erection is not so remote as to induce a belief that there are not . many witnesses, who must know the difference between the value of materials and labor at the two periods.
*326 It appears to me, that evidence of the original cost of the buildings, and of the mill-dam and raceway, with the evidence of variation, if any, in the price of materials and labor, was not only good and pertinent evidence, but that it was the only mean of arriving at a fair, honest, and conscientious estimate of the present value. I doubt whether any man, however high his qualifications, could undertake to state, with precision, the cost of such extensive erections, merely on inspection ; and the evidence in this case shows how very fallible the best judgments are upon such subjects.
It strikes me, very forcibly, that not only the appraisers, but the chancellor, have adopted an erroneous idea as to the rule of assessment applicable to this case; Mr. Mott seems to suppose, that the value of the raceway is not to be estimated according to its cost or real value, but what would be the benefit of it to the lessors; he says to Van Wyck, “ I suppose you would not be without the raceway for 10,000 dollarsand the chancellor speaks “ of the variations in business, and many other circumstances connected with such works, as destroying the analogy between the first cost and the present value.”
An indemnity to the lessees for the work and labor, and money laid out on the premises, with a deduction for the decays, was all that the contract contemplated. The lessees were not to derive a profit from any contemplated advantage which the lessors might make after the premises reverted to them. The lands, mill-seat, and natural advantages were theirs, and their rights came into full action on the expiration of the lease.
I am entirely satisfied, that the arbitrators refused to *hear legal, pertinent, and material evidence; and that such refusal amounted to gross misconduct in them; and that, by the well established principles of equity, it is good cause for setting aside the award. My opinion, accordingly, is, that the decree of the Court of Chancery ought to be reversed.
Yates, J.
The objection, that Anderson and Mott were not duly appointed, cannot be sustained ; it appears that each party nominated a person, and gave notice of it, and that both parties appeared before them, as arbitrators, without objecting to either of them; they are, consequently, concluded from alleging, that they were not indifferently chosen, according to the terms of the covenant. It. appears to me to have been the only correct course they could have adopted ; nor can the exceptions taken to the manner of appointing the umpire affect the appraisement or award ; it was not necessary that the two should disagree, to authorize the choice of a third person. In Coppm v. Humará, (2 Saund. 133. b.) the subject, with regard to the appointment or election of an umpire, is fully discussed, in a note to the case; and in support of the principle stated, the editor cites the case of Cowell v. Waller, (2 Barn. K. B. 154.) and Roe v. Doe, (2 Term Rep. 644, 645.) In *327 referring to the last ease, it appears that an objection was taken, because two arbitrators, who had the power of naming an umpire, had named one, before they had entered into the examination of the subject at all; but the court said there was not any ground for the objection, for it rather seemed to be the fairest mode of choosing an umpire. They added, it had been solemnly determined, about thirty years before, that arbitrators might elect an umpire the instant they began to take the matter into consideration. In the present case, however, it is not necessary to urge this principle ; for admitting that there must be a disagreement, to authorize the appointment or election of the umpire, the fact appears to be so. At the time it was made, the weight of evidence is conclusive, that the two arbitrators had been inspecting the premises, and conversing on the subject, for a part of two days, and, after comparing opinions as to the present *value, found it requisite to choose a third person. It is evident, therefore, that the difference of opinion or disagreement alleged to be necessary, did exist. There can be no question, then, but that this was an arbitrament according to the terms agreed upon at the date of the lease; and in pursuance of which, the appraisement, or selection of the arbitrators, took place at the expiration of the time limited. That the time was twenty-one years after the date of the first agreement, does not affect it so as to give a different character to the contract. It must, notwithstanding, be deemed and considered an arbitration, and the appraisement must either stand or fall, according to the settled principles applicable to awards, the binding nature of which, when honestly and fairly obtained, cannot be controverted. I should, at all times, reluctantly yield to any doctrine which would go to destroy their legitimate stability or conclusiveness. It certainly would be a dangerous innovation to place them on a footing with the verdict of a jury, as has been urged in the argument; they are, and ought to be, of a more binding force between the parties. As stated in almost every treatise and reported case on the subject, (3 Atk. 494. 1 Vesey, II. 2 Atk. 504.) it is a decision of a tribunal of the parties’ own choice and election; and no court should interfere with an award, unless there had been fraud, corruption, or misbehavior, in procuring it; for without a strict adherence to those rules, an award, instead of being final and conclusive, would, in almost every instance, be the commencement of a controversy, and produce endless litigation, to prevent which the parties must and.ought to be concluded by it. I do not think that the appraisement is so grossly extravagant and unjust as to justify an interference with the award on that ground; still it is evident, that the property has been considerably overvalued; and, it would seem, that the means resorted to, in directing the sides of the cog-pit to be boarded up, and the repairs made immediately before the appraisement, might in some degree have contributed *328 towards a fictitious increase of the value; yet, it is probable, that the safety of the mill required the closing of the cog-pit, and that those repairs had become necessary, to place the mill in a proper %tate and condition for delivering it to the lessors at the expiration of the time. No fraud ought, therefore, to be attributed to the lessors on account of those acts.
That the machinery erected in the mill, under the patent right of Evans, was protected by it, and that the right of using it was appurtenant, appears to me correct; but Evans having taken out his first patent in 1791, if the lessees had acquired the right previous to the year 1805, it is clear, that the patent under which the license had been obtained, must have expired before the termination of the lease; and then I do not think that the provision, contained in the law of the United States,extending this patent to Oliver Evans, passed in 1808, would have authorized the arbitrators to have taken it up as an item to be valued.
The act, after directing a patent to issue to Oliver Evans, contains this provision, “ that no person who may have paid Oliver Evans for a license to use his said improvements, shall be obliged to renew said license, or be subject to damages for not renewing the same.” The lessees having enjoyed this right for the full period intended by them, and the lessors having an interest in the machinery, under the lease, the provision cannot operate to their prejudice, and they ought not to be made chargeable ; but the case does not show at what time the license, under the patent of Oliver Evans, was procured. We must, therefore, infer, as the arbitrators did take it into consideration, that it was taken out subsequent to the extension of the patent to Evans, and, of course, that it has been correctly noticed by them.
It is further alleged, that this award ought to be set aside for the misbehavior or misconduct of the arbitrators ; 1st. in holding a private and ex 'parte meeting or communication with one of the parties, on the subject before them ; and, 2d. for refusing to hear evidence material to the inquiry, with regard to the same subject, offered by one of the parties.
There can be no doubt, if either of these charges is substantiated, that it must prove fatal to the award. In Burton v. Knight, (2 Vern. 515.) the principle, as to the first exception, is decided, that private meetings of the arbitrators with one of the parties, on the subject before them, ⅜ partiality sufficient to vitiate the award. In Spettigue v. Carpenter, (3 P. Wms. 361.) the plaintiff, having submitted to an award, desired the arbitratorio defer making his award until he should satisfy him as to some things which the arbitrator took to be against him, though this was within two or three days before the time for making the award was out, yet the request not being complied with', it was set aside, upon the ground that the arbitrator had acted unduly. Other cases might be *329 cited, of setting aside awards for the misconduct of arbitrators, for acts of the same nature; but the general principle is too well established to render it necessary. The truth of the above charges, then, is the important inquiry before us. It appears, from a minute investigation of the testimony, that the first charge, as to the private and ex parte communication, is groundless; the weight of evidence is clearly with the respondents. That charge rests altogether on the deposition of Anderson, in opposition to which Underhill, Mott, and Lydig concur in stating, that no such ex parte or private conversation or communication, was held by the appellants with Underhill, in the absence of the other parties. They state, that he was sent for, to obtain some information relative to the mill of Philip Van Cortlandt, not connected with this controversy; that Van Cortlandt was sent for at the same time, and was present with Van Wyck; and Underhill states, that Anderson, at that time, asked him some question relative to the cost of the dam and raceway, that he answered, he did not know, as no separate account thereof was kept, but only an account of the cost of the whole works. It is true, Mott and Lydig declare that they have no recollection of it; and one of them says, he has no belief of any such question being asked; but that it is perfectly reconcilable, for they might not have heard it. Admitting, however, that the question was asked, the parties were present, and what renders it altogether unimportant is, that nothing material was communicated by the answer, and that the decision of the arbitrators could, in no respect, be influenced by it; so that the arbitrators are not chargeable with the alleged ex parte communication. There appears, however, to be sufficient grounds for the second charge, that of refusing #to hear material evidence offered by the appellants. In order to present the facts, with regard to this offer, in the most unexceptionable point of view, I shall not advert to the testimony of Anderson and Van Wyck, but shall confine myself to the facts disclosed in the answers of Underhill, Mott, and Lydig. They all separately state, and admit, that after the appraisers had heard the allegations and proofs of the parties, and had conferred together, Van Wyck came into the room and offered to produce witnesses to prove the actual cost of the dam and raceway; that Lydig told him, with the acquiescence of the, other two appraisers, that such testimony was not material or relevant, as the inquiry was not, what the works had cost, but what they were then worth.
1 am not disposed to question the correctness of the opinion of the arbitrators, that the inquiry before them was as to the present value of the improvements; but that the testimony of the original cost of the dam and raceway was irrelevant, and would not have contributed towards ascertaining that value, in my view of the subject, is not correct. It will not be denied, but that information, with regard to the natural situation and *330 condition of the mill-site, and of the ground over which the raceway was carried previous to the making of those improvements by the lessees, would be indispensable, in order to discover what had been done, and to obtain correct knowledge of the amount of the original cost; it would be a leading fact in making that inquiry. The periods are not so remote as to render it impracticable to ascertain, by testimony, with reasonable certainty, the difference of expense in performing the same work at the expiration of the lease, and allowing for the deterioration of the dam and raceway. This would, perhaps, be the proper course in estimating the amount to be paid by the appellants, for it is not unfrequent to find, in operations of the same nature, a great difference in the expense, arising altogether from the natural situation of the ground, and the convenience of materials. Those advantages, if they existed in this instance, ought to have been known, and considered by the arbitrators as favorable to the lessors. It cannot be pretended that the appellants #were under obligations, by their covenant, to pay a sum equal in amount to what they would have been willing to give, if totally deprived of the dam and raceway, because they were the owners of the soil and site ; the materials- were taken off their land ; and the object of the covenant in the lease was intended to secure a perfect indemnification to the lessors, and no more; and the value of the improvements, taking into consideration such materials as were not to be paid for, according to the terms of the lease, is the true criterion by which the arbitrators ought to have been governed in making the ap-praisement. The evidence of the original cost and raceway, offered by the appellants, was. therefore, improperly rejected, and that is ground sufficient to set aside the award.
My opinion, accordingly, is, that the decree of the Court of Chancery ought to be reversed, that both causes be remanded, and that the bill in the original suit, in which the respondents are plaintiffs, and the appellants defendants, be dismissed; and that in the cross suit, wherein the appellants are plaintiffs, and the respondents and others, defendants, a feigned issue be directed to ascertain the value of the mills and appurtenances, according to the terms of the.covenants contained in the lease, and also the value of the timber and wood cut by the lessees on the demised premises, and other lands belonging to the lessors, for other purposes than firewood to be used on the premises, and that on the return of the issue, the court below déSee accordingly.
Platt, J., was of the same opinion.
Van Ness, J., was absent.
Allen, Senator.
The appellants, in this case, seek to avoid an award of arbitrators, appointed in pursuance of a covenant *331 contained in a lease of certain mill-sites, &c. in the county of Westchester.
The covenant is in these words, “ that at the expiration of the term, the mill or mills then standing on the premises, and whatever might appertain thereto, shall be valued *by twp persons indifferently chosen by the parties, and in case of their disagreement, by a third person to be chosen by the two.”
The third person was chosen by the two, and the property was valued at $ 18,000, exclusive of certain buildings, which formed a distinct subject of appraisement, and were valued at ⅜“ 500.
It seems to be conceded, that the award, on the tace of it, is excessive ; but it is a well settled rule in equity, that an award of arbitrators of the parties’ own choosing, unless outrageously excessive on the face of it, and such as would induce every honest man, at first blush, to cry out against it, cannot be set aside, unless there be corruption, partiality, misconduct, or the use of an excess of 'power in the arbitrators, or fraud on the opposite party; (3 Rep. in Ch. 49. 1 Cas. in Ch. 219. 1 Rem. 157. 2 Ch. Cas. 140. 2 Vern. 151. 1 Vern. 157. 9 Mod. G3. 1 Atk. 63. 2 Aik. 504. 3 Aik. 494. 529. 1 Ves. 11. 3 P. Wins. 361. 3 Vin. 139. pi. 39. 2 Eq. Cas. Abr. 80. pi. 8. 2 Vern. 514. 2 Res.jun. 15. 5 Ves. 846 6 Ves. 70. 282. 9 Ves. 67, 68. 354.). to which may be added, the case of a palpable mistake as to figures, or of one thing or fact for another. (1 Res.jun. 369. 2 Vern. 705. 3 Atk. 644. Amf. 245.) I agree most fully to the law on this subject, as laid down by his honor the chancellor; but I apprehend that he has mistaken the facts in the case, and erred in the conclusions to be drawn from those facts. The court, I think, should not be very astute in searching for reasons to uphold an award, where the damages, upon the face of it, are manifestly excessive; but, on the other hand, they should be eagle-eyed in looking into the proceedings and conduct of the arbitrators, and the acts of the parties, to see that every thing has been conducted fairly, impartially, and honestly.
Before we enter into a particular examination of the merits of this cause, it is proper that we should look at the testimony and standing of Anderson, one of the arbitrators, who has been examined as a witness.
The competency of this witness has been admitted ; but his credibility is sought to be impeached, principally on the ground of his having signed the award, and declared it to *be “ according to his best judgment and belief.” Anderson, as one of the arbitrators in this cause, perceived, that his associates were about to make an award, which he was conscious to himself was highly improper and unjust; he felt disposed, therefore, if possible, either to prevent it, or to lessen the amount as much as he could: when Mott and Lydig, the other two arbitrators, declared their opinion, that the mill-dam and raceway must *332 have cost $20,000, he observed, that he did not believe they had cost $> 14,000. Abraham IS. Underhill was then called in, as Anderson-states, and the question put by him to Underhill, as to the cost of the mill, raceway, and dam, and he answered, “ that they (respondents) had laid out. $¡20,000." A. S. U. in his answer, admits that the question was asked him, and he says, he answered, that, he did not know what they had cost, as no separate account had been kept, but an account of the cost of the whole of the buildings and improvements; he does not expressly deny, that he said they had laid out $¡20,000, though he is careful to add, that he had stated nothing false. Mott and Lydig, the other two arbitrators, say, they have no recollection about it; but they directly proposed to Anderson, that if he would sign the award, they would come down to $'18,000, which Anderson finally agreed to do, saying, at the same time, “ that sum was far beyond the value of said ■premises.'” In this particular, I think Anderson acted like most arbitrators, in like circumstances. I see nothing immoral or improper in such conduct. It is not to be presumed that Anderson knew any thing of the law on this subject; he concluded that the award, when made by a majority of the arbitrators, would be binding and conclusive upon the Van Cortlandts, whether he sigued it or not. And if, by signing it, he could reduce the amount of what he considered a most unconscionable award, it was his duty to do so, though it was still far beyond what he thought the real value of the property. It was a matter of compromise, therefore, which frequently takes place among jurors and arbitrators, for the purpose of making up a verdict or award. And I am not yet prepared to say, that tire integrity of jurors and arbitrators is to be impeached, on the ground that they have agreed to a verdict or signed an *award, as matter of compromise, for a larger amount in damages than they believed ought to be given. The words best judgment and btliif” may be considered mere words of form, put into the award by the attorney or other person who drew the award. As to the other disagreements between Mott and Anderson, respecting their conferring together, and the appointment of a third person as umpire, I consider them of little moment in the cause, when brought to impeach the integrity of the witness ; they were mostly ex parte conversations between them, which the one might understand difierent from the other ; but whatever these conversations and disagreements may have been, they were all merged in the final appointment of the umpire, and if the case had not been at all encumbered with them, the ends of justice might have been as well attained.
I come now to examine, more particularly, the conduct of the arbitrators after the appointment of the umpire, and to see whether it was fair and impartial.
It is admitted that there was no corruption in these arbitrators ; but I cannot say that the arbitrators have been wholly *333 free from 'partiality or misconduct, in their proceedings,* I think it is very evident from the testimony, that two of the arbitrators were determined to appraise the property in question at its original cost, else why make the declaration to Anderson, “ that they believed and. were of opinion, that the mill, raceway, and dam, must have cost $20,000and how could they arrive at this conclusion, except through the declarations of the Un-derhills, or one of them, either from ex parte conversation, or in the manner as testified to by Anderson'! Again, how happens it, that David Lydig, the umpire, when the arbitrators were deliberating on the subject of the appraisement, should observe to his associates, “ that the respondents were enterprising men, that they had taken the place in a state of nature, had laid out a great deal of money, and had made it a valuable property ; that, therefore, the Van Cortlandts ought either to renew their lease, or pay them what they had laid out;” thus pointing constantly to the original cost as the foundation of his opinion and his award; yet Mr, Lydig was unwilling to hear a syllable of proof on the subject of the ^original cost, and no objection being made to this proceeding by either of the other arbitrators, all testimony offered on that subject was wholly rejected as inadmissible. Now, it would seem to me, that upon their own principles, the arbitrators ought to have received testimony as to the original cost of the premises ; but, independent of this view of the subject, I think the testimony was improperly rejected. As an item of proof to aid them in forming a correct estimate of the present value of the property, by ascertaining the first cost, and adding to that the increased value of materials and labor, and then deducting therefrom the natural wear and decay of the premises during the lease, the calculation, in mv judgment, would have brought them much nearer the real value of the premises than they could arrive at from a mere inspection of them. Again ; this conduct of the arbitrators would seem, also, to account for the slight examination of the properly, as testified to by all the witnesses. Even Lydig himself says, “ he does not recollect that they examined every bolt and every stone.” One of the Fowlers, who was a witness in the cause, says, “ supposing the arbitrators wished to see the stones, he had three of them turned up, but they did not appear to take much notice of them, nor examine them, to ascertain whether they were burr-stones or of an inferior kind, and. thereupon the deponent discontinued, taking up any more of them.” The arbitrators seem, also, to have taken into consideration, in making the gross valuation, the improved state of the stand for milling purposes, and the great increase of business consequent thereon, which, under the covenant, formed no part of the value of the premises. They were only to appraise the buildings and their appurtenances in the state they were in at the expiration of the lease. This error seems to have been adopted by his honor the chancellor, also, when he speaks of “ the *334 great variations in prices, and labor and business, ant many other circumstances connected with such works.” But il ⅞ impossible for me to conceive how any mills, which hac been running for 19 years constantly, could be worth as much, imder any circumstances, as when they first commenced running or as much as the first cost.
#Taking the conduct and proceedings of these arbitrators together, as thus far detailed, and which I think is fairly presented by the case, it appears to me, that they were wanting in impartiality and fairness, and may be justly said to have misconducted.
2, Another ground of setting aside awards is, that arbitrators have exceeded their powers.
In this case, the arbitrators have appraised what are called the 'patent licenses of Mr. Evans, which, I think, were not a subject of valuation, being a mere personal privilege, which the Underhills might take away, and, according to the act of Congress of 1.808, were not assignable. If these rights had been separately valued, and the amount separately stated in the award, and this had been the only ground of complaint, the award might have been set aside pro tanto only; but the ap-praisement being in gross, the award affords no evidence to show the amount of the valuation, as was the case in Ambler, 245. cited at bar.
3. Fraud in the opposite party is another ground to set aside the award of arbitrators.
The respondents in this case having done certain acts which had the effect to deceive the arbitrators, and to produce an exaggerated valuation of the property, it must be considered fraudulent as to the appellants.
The first item of fraudulent conduct in the party is the declaration of Abraham 1. Underhill to the arbitrators, that the mill, raceway, and dam., or the whole expense of the buildings and improvements, cost 20,000 dollars. The party here was bound to know, or ought to have known, the first cost of these improvements, and, if asked the question, to have told the truth. He states, in his answer, that no separate account had been kept of the cost of each separate item of property ; but admits, that an account of the whole of the buildings and improvements had been kept, and he denies that he made any false declarations to the appraisers respecting the matters submitted to them.
By an exhibit in the case, it appears, that the whole expense of the mills and improvements at Croton cost only 5,953/. 1 Li. 9d., or 14,883 dollars and 97 cents; this exhibit was made in the hand-writing of one of the respondents, or %ome person in their employment, and, as testified by one of the Burlings, ivas handed to him and his brother, by the respondents themselves, on a settlement of their accounts as partners in the concern. This document affords pretty strong evidence of a want of good *335 faith on the part of the Underhills, and, in my judgment, goes far to impeach the answer of the respondents, when they say, '• they are confident, and believe, that the dam, raceway, and mills, including the alterations in the machinery, cost, at least, 18,000 dollars; and, also, the answer of Joshua Underhill, who states, in his separate answer, that “the whole expense of the buildings and improvements amounted to about 20,000 dollars
These respondents must, undoubtedly, have known of this exhibit, but had, probably, forgotten that they had furnished the Bur lings with it.
Another item of fraud in the respondents is, the repairs put upon the mills, &c. just at the expiration of the lease, and between the expiration of the lease and the meeting of the arbitrators.
These repairs have been treated lightly by the opposite counsel, and, also, by his honor the chancellor, in giving his opinion But it seems to me, that this conduct of the respondents is more serious in its Consequences than has been apprehended, and has not been duly appreciated. It was directly calculated to deceive the arbitrators, and to induce an overvaluation of the property. The charge in the cross bill, of using “unjust and improper means to conceal from the appraisers the state of repair in which the mills were,” before the arbitrators viewed and examined them, the respondents deny generally; they admit, indeed, that some short time previous to the expiration of the lease, they repaired, the grist-mill and plat form across the raceway; but they say nothing of any repairs subsequent to the expiration of the lease, and his honor the chancellor seems, m a great measure, to have overlooked this fact.
it is in proof, that these mills, &c. were very much out of repair at the time they ceased to be used. The Fowlers both testify to this fact; they say, “ several parts of the mill were in a decayed state, part of the frame was decayed,, *the roof was leaky, some of the main posts were rotten, several of the girts were decayed, and almost all the sills, and some of the sleepers ; some of the stone foundation was also much out of repair.” Now, some of the repairs were made just before the expiration of the lease, and after the respondents had ceased to use the mill, such as wedging up and endeavoring to raise some of the floor-beams that had settled, putting in part of a new sill, and repairing some of the cogs.” The two Fowlers also both testify to repairs subsequent to the expiration of the lease, such as “putting in new cogs, covering over decayed, posts of the mill with boards and shingles,” &c. William Fowler says, that “ two persons were employed for a fortnight in doing little jobs, by way of repairs, in and about the said mi ls.” And these witnesses both declare, “ that these repairs were calculated, to make the premises appear to better advantage.” It is also proved, that these mills ceased to be used in the winter of 1812, on account of the lease expiring in May following. Can *336 it, then, be believed, that if these repairs had not been made, and the arbitrators had examined the premises in the situation they were in, when the respondents ceased to use them, or at the expiration of the lease, that the valuation would have been so excessive ? It is hardly possible, therefore, to conceive, for what purpose these repairs were made, at the time, and in the manner they were made, unless to deceive the arbitrators, and to produce an overvaluation of the property in question.
It may be said, that the respondents had a right to make such repairs as they thought proper, during the continuance of their lease: This, no doubt, they had a right to do, if done in good faith; but in this case, the mills had ceased to run for several months before the lease expired, and the respondents had abandoned all idea of using them any more. They could not, therefore, have made the repairs, for the purpose of enabling them to enjoy the lease. They were not bound, by any covenant in the lease, to deliver up the premises in good repair, but the mills, &c. were to be appraised in the state and condition they were in when the lessees had done using them, or at the expiration of the lease. But it is still more difficult, upon any just and fair Calculation, to account for the repairs made after the term of their lease had ended.
The lessees were bound to deliver up the possession of the premises at the close of their term ; they certainly had no right to withhold the property from the lessors till they should be paid for their improvements. They had their remedy upon the covenant in the lease, to recover the amount of a fair valuation. But, instead of this, we find them holding over, and intermed-dling with the property, without any notice to, or direction from, the lessors. Why make these repairs at all, especially at their own expense, without a prospect of being remunerated therefor? What prospect of remuneration had they, except that of an increased valuation of the premises, which was afterwards to take place ? Besides, how could these respondents know what use the reversioners intended to make of this property when it came to their possession ; whether they would not direct the mills, &c. to be pulled down, for the purpose of building others, better and more permanent, or that they would not alter them, and convert them to some other manufacturing purposes <
all At any rate, I think they had no right to interfere at with the property, after the expiration of the lease. I cun arrive at no other conclusion, than that these repairs wore made with a view to deceive the arbitrators, and to produce an overvaluation of the property. It is said, however, in answer to this, that the appellants must have known of those repairs; and as they did not point them out, and expose them to the view of the arbitrators, we are to presume that they acquiesced in them. There is certainly no proof in the case, that the appellants knew any thing about these repairs. II *337 the respondents had acted in good faith, they should have not'.fied the Van Corto andts of any serious defects in the mills, and if they needed repairs, to have permitted them to have been made by the appellants, or by their direction." It would seem, then, that these repairs were made without any particular knowledge of the lessors ; and, I think, it is as fair to presume this to be the fact, as that the lessors acquiesced in them, because they did not particularly point them out. I should rather infer, #that the repairs, being done without notice, were done to deceive all other parties concerned ; and because they had the effect of deceiving the appellants as well as the arbitrators, the Underhills ought not., therefore, to profit by it. The fact is not to be denied, that the extent and effect of these repairs were not pointed out, either by the Underhills, who made them, and whose duty. I conceive it was, in good faith, to point them out, nor by the Van Cortlandts. Nor does it appear, that the arbitrators were, in any manner, made acquainted with these repairs, and, therefore, might have been deceived by them, in making up their judgment as to the real value of the property.
ti The same observations might apply to the nailing up of the cog-pit, and the laying of loose boards over the raceway, &c.; for there seems to have been no real necessity for nailing up the cog-pit, to keep out evil-disposed persons, as stated in the answer of the respondents, any more than at any former period. They lived in the house as before, and the millers also continued there as formerly; but one of the witnesses says, that Abraham I. Underhill told him that this was done “ to prevent Van Wyck getting into the mill.” And, it would seem, that these cog-wheels were very rotten and defective ; for, from the testimony of one of the Fowlers, who tended the mill, it appears, that in the fall of 1813, soon after the Van Cortlandts took possession of the premises, “ one of the main cog-wheels gave way and went to pieces, from natural decay and rottenness and, in 1814, it became necessary to put in a new shaft for one of the water wheels. Here it is said again, that Van Wyck, the agent, might have knocked off these boards and discovered this rottenness. But Van Wyck did not suspect the honesty and fair dealing of the Underhills; not knowing, therefore, or suspecting the motives which led to this act, he was not aware that there was any design practised upon the Van Cortlandts. Besides, if the arbitrators, whose particular business it was to examine thoroughly, did not complain of the want of light, why should Van Wyck l But I forbear to comment upon this conduct of the respondents; enough is disclosed in the case, to satisfy me, that the award has been procured, both by the misconduct of the arbitrators %nd the fraud of the respondents. I am, accordingly, of opinion, that the decree of his honor the chancellor be reversed, and a new valuation directed.
*338 Van Vechten, Senator.
The material facts in this cause have already been fully stated. I shall, therefore, proceed at once to consider the points which it involves. The appellant* seek to be relieved from an award made against them, ami in favor of the respondents; and lam free to acknowledge, my first impressions were strong against the justice of the award. I have, therefore, examined lire subject with considerable solicitude and great deliberation. Tins examination has, however, resulted in a deep conviction, that the objection-; which are made to the award are untenable. But I must be permitted to add, that the opinions winch have been delivered by the judges of the Supreme Court have produced in my mind some distrust of the correctness of the conclusion at which 1 have arrived.
The general grounds on which an award may be impeached, according to the settled doctrine relative to awards, appear i<> me to be resolvable into corruption, or gross misconduct in the arbitrators, or excess of power, or imposition. Court'-, both of law' and equity, have uniformly asserted, and adhered to this doctrine, for the most forcible reasons. The parties to an arbitrament elect their own judges, and voluntarily clothe them with powers commensurate to a final decision on then rights, unshackled by legal forms and technical míes. E\ cry subrnission may, therefore, be considered as evincing the intent of the parties to transfer the power of deciding finally upon the matters submitted, from the judicial tribunals to the arbitrators.
It is not surmised, in the present case, that, the arbitrators have acted corruptly. We must, of course, look for some other ground to set aside the award ; the great topics of complaint, on the part of the appellants, are, I. An excessive valuation of the property appraised; 2. Misconduct of the arbitrators in refusing to hear competent evidence; *and, 3. Undue means used by the respondents to influence the award.
1. The question of value was expressly submitted to the judgment of the arbitrators, who were to appraise the mill or mills, standing on certain lands which had been leased to the respondents, or their assignees, for a term of years, together with, whatever might appertain thereto. There can be no doubt, that the submission authorized, and probably the parties contemplated, an appraisement, upon the personal view and examination of the arbitrators ; for it appears, that they were men whose concern in mills and milling business, had. as was supposed, qualified them, in an eminent degree, for that purpose. In such a case, the objection of overvaluation, when unsupported by proof of corruption or imposition, cannot be listened to without subverting the foundation of the law of awards. In Knox v. Symmond, (1 Ves. jun. 369.) Lord Thurlow laid down the rule, that an award cannot be set aside upon the simple, ground of erroneous judgment in the arbitrators, for to *339 Morgan v. Eyre, and great seal In Mother, (2 Ves. jun. 15.) Lord Chief Justice Judges Ashhursi and Wilson, (when they held the as commissioners,) said, the court does not take upon itself to inquire, whether arbitrators have judged right or wrong upon facts ; and on a rehearing before Lord Loughborough, he observed, that if parties agree to refer matters to judges of their own choice, this court cannot correct the error of their judgment upon facts. In Emery v. Wase, (5 Ves: jun. 846.) Lord Alvanky said, that arbitrators chosen by the parties ever had, and, iie hoped, ever would have, both at law and in equity, an authority, so that the award should not be overhauled, unless for fraud, imposition, or gross mistake. In Waller v. Ring, (9 Mod. 63.) the bill was to set aside an award for a palpable excess of damages, and Lord Macclesfield held, that he could not disturb it, upon the ground of hardship, because the arbitrators were judges of the parties’ own choosing. In Jackson v. Ambler, (14 Johns. Rep. 103.) the present Chief Justice observed, that arbitrations are domestic tribunals ; the arbitrators are chosen by the parties themselves, and frequently #mingle in their decisions their own knowledge of the matters in dispute. Their ends are mainly honest, and tend to terminate intricate disputes with very little expense to the parties; for all these reasons they ought to be reviewed indulgently. Again, in the same cause, (lb. 105.) his honor said, that in an arbitrament, by the mere act of the parties, it cannot be made an objection to the award, that it is against law. The doctrine of the cases above cited clearly shows, that the objection of an overvaluation in the present case, unconnected with fraud, gross misconduct, or imposition, cannot be sustained ; for this court cannot enter into the valuation, without invading the exclusive province of the arbitrators, assigned to them by the act of the parties, any more than it could set aside the award, on an objection that it was against law.
2. The objection of misconduct in refusing to hear competent evidence, as collected from the pleadings and proofs in the cause, rests on the arbitrators having declined to hear evidence of the real cost of constructing the dam and raceway. It will be perceived, on looking into the case, that the evidence to this point is somewhat loose, ambiguous, and contradictory; I do not. however, mean to stop to examine it on either of those grounds. But in order to determine correctly upon the question here raised, it. must be remembered, that the arbitrators were the rightful judges of the materiality as well as of the weight due to the evidence offered. For they were to ap praise the mill or mills then standing, &c., with the appurtenances, which evidently implies, that they were to view the premises, as they stood, and thereupon form and express their judgment of the value. It cannot be denied, that they were authorized to hear the testimony of witnesses, to aid them in *340 making their estimate of value; but, notwithstanding such testimony, it was confided to, and required of, them to fix the value according to their own judgment. Hence, it may reasonably be inferred, that the arbitrators were chosen lor their skill, as mill owners or builders, acquired by their practical concern in such establishments. The evidence offered and rejected, was not that by which they would have been bound to regulate their appraisement; for a distinction is here #to be taken, which, in mv view of the question, solves every difficulty. When facts are in dispute before arbitrators, which cannot be ascertained, otherwise than by a recurrence to parol evidence, the refusal to hear the evidence would support the charge of gross misconduct against the arbitrators, because it would shut out the light which was to enlighten and guide their judgment. The evidence, in the present case, was not offered to establish disputed facts, but to aid the arbitrators in making an estimate of the value of certain visible and specified erections. They considered it immaterial for the purpose intended. To what end, then, should they have received it ? Can the exclusion of evidence, which they were not required to regard, when in collision with their own judgment, furnish a solid objection to their award ? Is it pretended, that they have not made an honest appraisement, according to the best of their judgment? Surely not. Can any one suppose, that the evidence offered would have varied their appraisement? Certainly not; for that would be indulging supposition against the fairness of the award, supported as it is by the oaths of the arbitrators. This was a submission by the mere act of the parties, in which, according to the doctrine of the cases above cited, the award of the arbitrators cannot be disturbed, if honestly made, for error in judgment, either as to the facts, the law, or the value. The case bears no analogy to a trial by jury, where the court is to pronounce upon the admissibility of evidence, and the jury are to decide on its weight. In that case, if the court o\er-rules competent evidence, it withholds from the jury the matters upon which they are to found their verdict, and, therefore, deprives the party offering the evidence, of the means to prove his right. But here the parties have confided to the arbitrators the double office of judges and jurors, and have reposed themselves upon their skill and judgment, to be exercised on a personal view and examination of the subjects to be appraised. It, therefore, appears to me an unsound objection to the award, that the arbitrators refused to hear evidence which they deemed immaterial, and, consequently, were not bound to regard in their estimate of value.
*3. Let me nowr examine whether the objection, that the respondents have, by undue means, influenced the award, has been made out. It is founded upon the allegations and proofs, that, about the time of the expiration of the lease, the respondents covered certain decayed and leaky parts of the mills with *341 boards and shingles, and strewed meal, or flour, and bran, on the floor, to elude the discovery of such decay, and the marks of the leaks. Several witnesses swear to the acts charged, and some depose to their being done with the intent alleged by the appellants. It will, therefore, be necessary to discuss this evidence.
In order to render it effectual, it should appear that success attended the deceptive means used by the respondents. What, is the evidence upon this subject ? That the examinations of the mills by the arbitrators were conducted openly, and in the presence of the parties, or their agents. Were either of them ignorant of the age of the mills, or can it be presumed, that they were unapprized that the buildings and machinery had deteriorated by the lapse of time and constant use ? This is not pretended. How, then, can it be supposed, that the flimsy practices imputed to the respondents have eluded either the discernment of the arbitrators, or the naturally prying observations of the opposite parties ? Does Van Wyclc, who attended the examination, as agent for Mr. Van Cortlandt, swear that he was deceived by them ? No. Then, I ask, whence the inference is, or can be drawn, that these practices imposed on any one? Neither Anderson nor Van Wyck, who had the best opportunity of knowing it, suggest even a belief of the fact of imposition ; and the arbitrators, Lydig and Mott, repel it, by their testimony; they say that they examined the premises until they were entirely satisfied. It is true, that some of the appellants’ witnesses depose, that the examination was rapid, and less minute than in their opinions it ought to have been. But who were the proper judges of the sufficiency of the examinations—third persons, who were casually present, or the arbitrators whom the parties had mutually chosen for the purpose ? Does it appear that any person requested a more particular examination ? No. IIow happened this, if any one present deemed more particularity in the examination necessary ? *The objection of imposition on the arbitrators cannot be sustained, unless they were in fact imposed upon. A fraud resting merely in intention, does not require the aid of the correcting power of this court; nor does a meditated, but unex-ecuted imposition upon arbitrators, furnish either a legal or equitable ground to impeach their award. Upon the whole, I can discover no evidence in the case to support the last objection ; but, on the contrary, the whole current of the proof bears, in my opinion, directly against it.
Under these impressions, I have arrived at the conclusion, that the appellants have failed to make out any objection to the award in question, which is sustainable either at law or in equity. It is probable, that in point of fact, injustice may have been done to the appellants; that the arbitrators may have erred in the amount of their appraisement; but I can perceive nothing in the terms of the submission, or in the law of awards, *342 that gives to this court the power of correction. Lord Redi s-dale said (1 iSih. <⅜ Lef. 234.) it is not sufficient, to authorize the court to interfere, that injustice has been done. Rules are established, some by the legislature, some by the courts themselves, for the purpose of putting ail end to litigation ; and it is more important that an end should be put to litigation, than that justice should be done in every case; the truth is, that owing to the inattention of parties, and several other causes, exact justice can very seldom be done. The late chief justice observed, (11 Johns. Hep. 220.) that it is better to preserve consistency in legal principles, although it may not always suit the equity of the individual case, than to make fin we principles bend to what may be thought the substantial ju-t ce of each particular case. Let then the abstract equity of this case be what it may, unless the established rules by which this court is bound to administer justice, entitle the appellant' to the relief which they pray for, the court cannot and ought not to grant it. I am, therefore, of opinion, that the decree of the Court of Chancery ought to be affirmed.
' Rut a majority of the court (a) being of opinion, that the decree of the chancellor ought to be reversed ; it was ^thereupon ordered, adjudged, and decreed, that the decree of his honor the chancellor, in the original suit, wherein the respondents are plaintiff's, and the appellants are defendants, be, and the same is hereby reversed: and that the bill, in the original suit, be dismissed; and that the plaintiffs therein pay to the defendants therein, their costs in the court below, to be taxed: And it is further ordered, adjudged, and decreed, that the decree of his honor the chancellor in the cross suit wherein the appellants are plaintiffs, and the respondents are defendants, be. and the same is hereby, also, reversed ; and that the plaintiffs be restored to all things they may have lost by the last mentioned decree, and have such relief as is sought for, and graved in and by their said cross bill: And it is furtlu r ordered, adjudged, and decreed, that the proceedings removed into this court be remitted to the Court of Chancery, to the end that the decree of this court be carried into full effect.
Decree of reversal.

 For reversing, 19; for affirming, 7.