THE STATE OF MICHIGAN, Appellants, *v.* THE PHŒNIX BANK OF THE CITY OF NEW YORK, Respondents.

An award by a board of State auditors, obtained on an *ex parte* hearing, upon a fictitious and groundless claim, may be impeached for fraud and imposition on the part of the claimant.

Money paid under such an award may be recovered back on establishing the fraud, but only to the extent that the State was damnified by the wrong.

APPEAL from the General Term of the Superior Court of the city of New York. The action was tried before the Hon. JOSEPH S. BOSWORTH, Chief Justice of that court, without a jury.

A judgment in favor of the plaintiffs was entered upon the report and findings of the judge for $35,603.74. This judgment was appealed to the General Term of the same court, which reversed the said judgment, and ordered a new trial, with costs to abide the event, from which an appeal is brought to this court, with stipulation that judgment be absolute if the judgment of the General Term be affirmed.

*J. L. Jernegan,* for the plaintiffs.

*Chas. O'Conor,* for the defendants.

TIFFANY.—VOL. VI.     2

POTTER, J.   A great proportion of the labor made necessary on the review of this voluminous case could have been avoided, and many of the questions so elaborately argued and spread out upon the briefs of counsel dispensed with, if the system of practice now established as the law in regard to a review of such cases had been pursued.

The judge at Special Term found specifically the facts severally, and his conclusions of law severally and separately from the facts, as required by the Code (§ 267).   The defendants filed their exceptions in due form, to both the findings of fact and to the conclusions of law.   The General Term reversed the judgment, and ordered a new trial.   By § 268 of the Code, the judgment of the Special Term shall not be deemed to have been reversed on questions of fact, unless so stated in the judgment of reversal.   It was not so stated in the judgment of reversal in this case.   This court, therefore, upon this review, are to take the facts as found by the judge at Special Term to be true.   We so held in the case of *Crocker* v. *Crocker*, decided at the last term of this court, and so the statute directs.   All that portion of the argument upon the one side to impair the force and correctness of the facts found, and upon the other side to sustain them, are consequently superfluous.   The duty of this court, then, is to determine whether the conclusions of law drawn from the facts as found by the judge are sound.

In the discussion of the law, it will of course be necessary to deal at some length with such of those facts as are controlling, each of which will be best presented as corresponding with the conclusions of law to which it relates.   It is undisputed that the defendants, in March, 1858, advanced to one Norton, who held at the time an official financial position in the State of Michigan, two drafts, amounting to $16,400, one on the Farmers' and Mechanics' Bank of Detroit for $8,500, the other on the Bank of River Raisin, Monroe, for $7,900.   These advances were made on the request of Stevens T. Mason, who was then governor of Michigan, and on his promise, in effect, that they should be paid from anticipated funds to be raised for said State upon the bonds of said

State, to be negotiated by John Delafield, the president of the Phœnix Bank. It remained a disputed question whether there was any authority on the part of Mason or Norton, in behalf of the State of Michigan, to contract for this advance. That Mason intended to pay it out of funds belonging to the State, without regard to the question of his right to do so, is quite clear; that he acknowledged it to be a State liability, and that he violated his solemn promises to pay it as an advance to the State, is equally clear; and upon this point the judge at the trial found as a fact as follows :

"1st. There was never any liability in equity and good conscience on the part of the State of Michigan to the Phœnix Bank to pay or refund to the latter the $16,400 which it advanced to John Norton, Jr., on the 13th March, 1838, or any part thereof."

As a fact, this finding is not excepted to, but the defendants have excepted to it as a conclusion of law, as perhaps it is. No authority of law, however, has been shown upon the trial or upon the argument, that either Mason as governor, or Norton as the financial officer of the legislature of that State, had power to contract such a debt on behalf of the State. A contract of like character has had an adjudication in the highest court of this State (*Delafield* v. *The State of Illinois*, 26 Wend., 192), where in effect it was held that all the State officers together, including the governor, the auditor and fund commissioners, could not legally make such contract, because the power was not expressly conferred by the statutes, neither could they afterwards directly or indirectly ratify such contract when made, certainly not by any act by which acquiescence could be inferred. In its features, the case cited is so nearly identical with this as to make it authority. And it is not insisted by the defendants on the argument before this court, that any such power had been conferred by the State of Michigan upon its governor or the financial officer of its legislature. These officers acted without authority from the State, and afterwards violated their own individual faith. Upon this point, therefore, we may hold that this demand was not legally contracted by the State, within the authority

of *Delafield* v. *State of Illinois, supra,* and authorities there cited.

The draft of $8,500 upon the Mechanics' and Farmers' Bank, was paid to Norton, who was cashier of the Michigan State Bank, and who placed that amount on the books of his bank, to the credit of the Phœnix Bank, but failed to pay them that sum. The draft on the River Raisin Bank, was not presented nor paid to Norton, and these demands remaining unpaid, the Phœnix Bank in March, 1840, about two years after the advance, gave notice to the River Raisin Bank, and directed them to refuse payment of the draft. The case fails to show what disposition was finally made of this draft. In June, 1840, the defendants employed one Charles H. Stewart, as their agent and attorney, to collect or obtain their claims upon the two drafts in question, claiming that the demands were against the State, but authorizing said Stewart by letter dated 10th June, 1840, to receive propositions from any other quarter than from the State, for securing the debt or any part thereof, provided he did not weaken or release their claim upon the State. At this time both the Michigan banks in question, were in a precarious condition, and their failure regarded as highly probable, and Stewart submitted this claim to the Auditor-general of the State, and upon advice with him, it was deemed prudent, that settlements should be made with such banks by accepting from them the best securities they could be induced to give; to become eventually the property of the Phœnix Bank or the State of Michigan, as the latter should, or should not admit its liability to the Phœnix Bank, and pay their said claim; but the auditor-general in yielding to this proposition, put his individual assent to it, upon the express ground that he did not thereby recognize the claim, or intend to give it any effect or force against the State. It must be borne in mind, that the auditor-general had no power to give any binding assent to this proposition. He had no power by his assent, or by a positive contract to create, continue, or revive a debt against the State. He was certainly a State agent for certain purposes, to perform certain duties, but his

powers were conferred by statute, which specifically defined his powers and duties, and he could only act within those powers, and his assent to the proposed measure was rather the advice of friendship, qualified by full notice that he would not act officially.

Stewart made a settlement with the River Raisin Bank, and on exhibiting to them his letter of power of June 10th, above mentioned, they did not deem that sufficient authority for said Stewart to act between said Phœnix Bank and themselves. Stewart then wrote and obtained another power dated 4th August, 1840, as follows: "You are hereby authorized to adopt all or any such measures with regard to our claim on the State of Michigan, as in your judgment shall seem right and proper, and best calculated for the security and ultimate recovery of the same." This power Stewart left with the River Raisin Bank, and upon their settlement, he took a bond and mortgage judgment, a judgment, an individual note, and a draft on the Michigan State Bank, in all amounting to $8,510 $\frac{15}{100}$, and he gave them the following receipt: After enumerating the items received, he adds, "Received September 23d, 1840, of the Bank of the River Raisin, eight thousand five hundred and ten dollars and fifteen cents as above, in full payment of their indebtedness to the Phœnix Bank of New York, for moneys collected on their account." Signed, "CHARLES H. STEWART, attorney and agent for the Phœnix Bank."

On the 2d October, 1840, Stewart settled with the Michigan State Bank, and thereupon executed to them a paper, showing the terms of such settlement as follows:

"The Michigan State Bank, Detroit, to the Phœnix
    Bank, N. Y., ............................. Dr.
1838, March 13th. For our draft on the Farmers'
    and Mechanics' Bank, Detroit, of this date, ...  $8,500 00
Interest on above compromised by agreement, ..    500 00
Draft on River Raisin Bank on you, in favor of
    Charles H. Stewart, our agent, .............    155 53
                                                 _____
                                                  $9,155 53

CR.

| | |
|---|---|
| By Illinois and Michigan canal scrip, .......... | $500 00 |
| By conveyance of 2,397 40-100 acres of land in Saginaw county, by agreement in full, ....... | 8,655 53 |
| | $9,155 53 |

"Received the above in full discharge of the foregoing account. Signed, CHARLES H. STEWART, attorney and agent for the Phœnix Bank, N. Y." "Detroit, Oct. 2d, 1840."

The lands above mentioned were conveyed by the Michigan State Bank to Stewart, "in trust for the Phœnix Bank of the city of New York, or the auditor-general of the State of Michigan, whichever should assume the debt thereby settled by the party of the first part, the said Michigan State Bank."

The form of these discharges so given to these two banks from the Phœnix Bank, who was their legal creditor, was a full settlement and payment of the legal claim. Between the parties legally liable to pay, and the party legally entitled to receive the proceeds of the payment, it was an absolute and unconditional accord, satisfaction and cancellation of all legal demands. Never having had any legal rights against them, as we have shown, what rights, or what claim, then, remained to the Phœnix Bank against the State of Michigan? The answer is simple. It was the equitable moral right, based on the unauthorized pledges of faith of faithless State officers, that the State should pay the debt; nothing more. It was, doubtless, in the hope that the pride and honor of the State might be successfully appealed to, to keep good the pledged faith of its public officers, and save their honor, and make good to the Phœnix Bank the losses sustained by the accord and settlement that Stewart, their authorized agent had made. Stewart, whose whole conduct seems to have been characterized by fairness as well as legal skill, took some of the securities, to wit, the lands, from the Michigan State Bank, in a trust form, but not the securities from the other bank. He thus became the actual trustee of the Phœnix Bank as to the lands, but could only be the trustee for the

State of Michigan by their ratification of his act, which they declined to do.

After these settlements by Stewart with the banks, he informed the auditor-general of Michigan of the terms of his settlements. For five successive years, to wit, in 1841, 1842, 1843, 1844 and 1845, he urged this claim upon the legislatures of Michigan, and fairly stated to them what he had done, and that on payment of the debt, the State would be entitled to the benefits of his settlements. In these efforts he was unsuccessful; the State thus refused to acknowledge or meet the claim.

Stewart's claim before the legislature, as well as his arguments, were presented in writing, setting forth the reasons why he settled with the two banks, in one of which applications he offered to compromise the claim by the Phœnix Bank, he holding as absolute, his settlement with the River Raisin Bank. Stewart also informed the State officers of Michigan of his settlements with those banks, but never succeeded in having the demand compromised or recognized by them. In February, 1842, Stewart informed the Phœnix Bank that he had then received $225.75 on one of the securities taken of River Raisin Bank. On the 9th of November, of the same year, he advised them to make a change of some of the securities he had taken; to which they replied, leaving him to act in that regard according to his discretion. He did so act, and changed the securities. By the 30th October, 1843, Stewart had received from the securities taken from the River Raisin Bank about $2,000 above his expenses, and had changed the remainder of those securities, as he informed the Phœnix Bank, into good lands in Michigan." In 1848, Stewart left the State of Michigan, and the claim remained without further action on it against the State for a period of some six years. On the 5th August, 1852, he conveyed to the Phœnix Bank all the lands that had been conveyed to him by the Michigan State Bank, by deed absolute on its face. By this act he discharged himself of his trust, by conveying to the only party for whom he was acknowledged to be a trustee, all the lands and property so held in trust. He

could not in law convey to them a trust; he could only convey the property so held. The act of conveyance by him, and the acceptance of the conveyance by the Phœnix Bank, invested the latter with absolute and unqualified legal title to the property so conveyed, not only, but was a full ratification of the accord and satisfaction of the settlement made by him with the banks; and thus acknowledging those banks to be their legal debtors, and themselves to be the legal creditors of those banks.

The judge found as a fact, "that the motive of the Phœnix Bank in taking this deed was to put itself in condition to transfer to the State of Michigan in case of a settlement." The motive of the bank, however, had no effect upon their legal rights. On the same day of the date of this deed, the Phœnix Bank, in a deed reciting their appointment of Stewart as attorney, his authority, his powers, and his acts under his powers, and his conveyance to them of the securities taken, and the delivery over to them of all his papers and transfers of such securities and papers relating thereto, including his legal argument, fully discharged and released said Stewart from all claims, demands, accounts and responsibilities in the premises.

The judge, at the trial, also found as a fact, "that the State of Michigan never assented to, or had any notice prior to January 1st, 1855, of the execution of either of the said deeds of August 5th, 1852 (above mentioned), of the acts and doings of the said Stewart in respect to the said securities so as aforesaid received by him on his said settlement with said River Raisin Bank, or of the notice so as aforesaid given by said Phœnix Bank to the River Raisin Bank not to pay the said draft for $7,900, so as aforesaid advanced to said Norton." This finding, though excepted to in effect, was not reversed by the general term; and, on this review, must therefore remain, and be regarded as an established fact.

In January, 1851, a new constitution for the State of Michigan went into effect. An article in this constitution contained a prohibition to the legislature to audit or allow private accounts against the State; but by another article,

" the secretary of State, State treasurer," and commissioner of the land office, were constituted a board of State auditors, to examine and adjust all claims against the State, not otherwise provided for by law. It was the duty, by a law of the State, of the attorney-general, to appear in behalf of the State before this board, when they sit to audit such claims. The duty of the board was to give him timely notice of their meetings. The law made it the duty of this board to examine, adjust and settle all claims and demands against the State not otherwise provided for by law, provided they be established by competent testimony. They were directed to keep a record of their proceedings containing the claim, abstract of evidence, and amount adjusted in favor of the applicant. Each member had power to administer oaths to parties or witnesses, to examine persons under oath; and the board had power to issue subpœnas to witnesses, and to compel their attendance, and to set off legal or equitable claims.

The present defendants are a corporation, the successors of the old Phœnix Bank, being composed mostly of the old stockholders, having purchased the old assets, including the claim in controversy, and continuing most of the officers of the former bank. No question is raised as to the parties. The right of the State of Michigan to sue in our courts was settled in the court of errors, in *Delafield* v. *State of Illinois, supra.*

While the provisions of this constitution and these laws last above mentioned, were in force, the defendants, the present Phœnix Bank, employed one George V. N. Lothrop, a counselor-at-law at Detroit, to take charge of the prosecution of this claim against the State of Michigan, and delivered to the said Lothrop the various letters and paper writings relating to said claim received from Stewart, and including the said deed of 2d October, 1840, from the State Bank of Michigan to Stewart, and also Stewart's deed to the Phœnix Bank. The said Lothrop, by virtue of his said employment on the 12th May, 1854, presented the claim of the present defendants to this board of State auditors of the

State of Michigan, at a regular meeting of the board, all the members being present; and in support of such claim, he presented and laid before the said board as evidence of the justice thereof, various paper writings, and the claim of the two drafts on the two Michigan banks aforesaid, made out in form, charged as follows: "John Delafield, agent for the State of Michigan, debtor to the Phœnix Bank, N. Y., $16,400, with interest from 13th March, 1838." Then followed an affidavit of John Delafield, detailing the history of, and the manner of obtaining said advances. This affidavit, however, was dated 10th June, 1840. It stated as a fact, that such advance "never has in fact been paid, nor was any deposit made in the Phœnix Bank by the State of Michigan, nor to their credit."

This statement was doubtless true, speaking as at the date of that affidavit. The said Lothrop also presented to the said board his own personal statement and argument in writing. (The attorney-general, though notified, failed to appear in behalf of the State.) The following extracts from Mr. Lothrop's written statement seem to have been adopted as the truth, and they clearly have a bearing upon the findings of the judge. Mr. Lothrop says: "The standing of the claim, as well as the amount, will entitle it to your fullest investigation. I do not hesitate to invite such inquiry; for, if the claim is not well founded both in law and equity, I ask nothing at your hands."     *     *     *     *
"The claim of the Phœnix Bank is for the sum of $16,400, advanced to the State on the 13th March, A. D. 1838." This statement of Mr. Lothrop is then historical, to a considerable length, to prove the faith of the State pledged to pay the demand. At the end of which history, Mr. Lothrop claims to have established six propositions; the 6th and last of which, only, as a statement of fact, is important, and is as follows: "6th. *That said faith was violated, and the Phœnix Bank has never been repaid a dollar to this day.*" This language had reference to the day of that hearing. After producing some further documentary evidence of a claimed State recognition, Mr. Lothrop puts a hypothetical proposition, as follows: "If

the above are facts, and all the material facts, I believe there is not a man in the State who would not at once say, that *the claim* is just, and should be met at once." Then, after assuming that he has established the claim, and the liability of the State, Mr. Lothrop says, he will proceed to inquire whether there are any *defenses* to the claim. He then says, "*I will fairly and fully state every defense that I have ever heard hinted at.* They are three in number:

"*First.* That Norton never credited this advance to the State." This he concedes in his argument to be true, but gives the excuse for it.

"*Second.* That the draft on the bank of the River Raisin was never paid, for it is conceded (he says) that the other draft was paid." This objection by a legal argument he answers; and then

"*Third.* That Norton received the drafts, to collect them for the Phœnix Bank." This objection he declares to be false, and proceeds with his argument to show it.

This seeming candor on the part of the defendant's agent and attorney, thus made in writing, thus challenging a denial of its truth, left with the board as a part of the case, and which they seem to have adopted as evidence, was doubtless the better appreciated by this board of auditors, and as inducing extra candor on the part of this agent, because of the absence of the counsel of the State, the attorney-general. But if the mere profession of candor, and the pledge of this agent and counsel fully and fairly to state every defense on the part of the State that he had ever heard hinted at, had failed to secure the confidence of this board of auditors in the sincerity and truthfulness of the statements he made to them, it was followed by such a moral and patriotic strain of reasoning as doubtless secured him success; and we should do injustice to the case, did we fail to copy some portions of it. It must be remembered that this *candid* and *truthful* statement is in writing, and is part of the case. In his answer to this third defense that he had only heard hinted at, this agent of the defendant says, "I do not know that it was ever *seriously* set up as a defense, but if it was, it must

have been at a period when the hard necessity had arrived of excusing a *political* sin or delinquency by transforming it into a private one. The only way to ward off the charge that Norton was a faithless and embezzling public officer, was to concede that he was a private scoundrel." At the close he adds: "I now *believe* that I have given a *fair* presentation of this claim. I have no hesitation in saying *in the most solemn manner*, that as a lawyer I have no doubt, that any court of justice, could it be brought before them, would at once render judgment for the claimants."

"The circumstances of the State may have excused delay in acknowledging the claim, but I confess I do not see how anything short of the grossest repudiation can justify its rejection.

"The faith of the State, when pledged by its public officers, duly authorized, should be above all price. Nor, in my judgment, where the justice is clear and unequivocal, should it ever weigh its honor against a technical defense.

"As a citizen, I should claim for my beloved State a sensitiveness to its pledged faith and honor more delicate than that which is required in private life. But, as the counsel for the claimants in this matter, I ask for no more exact measure of justice than the law applies in the dealings of individuals."

He then refers with pride to a sentiment from the message of Governor Barry in 1842, which he adopts. The sentiment is as follows: "The same principles of equity which bind the consciences and govern the actions of individuals in dealings of a private character, ought ever to regulate the conduct of States. *More imperative, indeed.* Upon them rests the obligation of such principles, since their views of justice and uncontrolled will constitute the only rules of their action." Then, adding for himself: "I have, therefore, felt it especially incumbent on me to make, on behalf of the claimants, an incontestable case."

Upon the documents so produced, and upon the foregoing written statement of the claim by the agent of the Phœnix Bank, the said board of auditors, on the 2d of December,

1854, were induced to decide, and decided, that the said Phœnix Bank was justly and equitably entitled for principal and interest on said claim to $35,603.74, and on the 4th day of December, 1864, paid them that sum.

The following material findings of fact by the judge on the trial, following the preceding statement, are a part of the case, and, as they stand, unreversed by the General Term. By the provision of the statute before referred to, they are the facts upon which this court are to pronounce their judgment. Those findings are as follows:

" The members of the said board had not, nor had either of them at the time said claim was presented, or while the same was under consideration, or before the aforesaid decision thereon, or before the payment by the State of said sum of $35,603.74, any actual notice or knowledge or suspicion of the settlements so as aforesaid made with the Michigan State Bank and the River Raisin Bank, or with either of them, or of the existence of the said deed of October 2, 1840, or of the said deed of August 5, 1852, from said Stewart to the old Phœnix Bank, or the deed of settlement and release between them of last said date, or of any of the aforesaid acts of said Stewart as agent of the old Phœnix Bank.

" That the allegations in the said written communications by Mr. Lothrop to said board of State auditors that the debt to the Phœnix Bank never has in fact been paid, and that he would fairly and fully state to said board every defense he had ever heard hinted at, and the statement which he did therein make in regard to the alleged or supposed defenses; and his omission and the omission of said Phœnix Bank to notify said board of the said notice given by the Phœnix Bank to the River Raisin Bank not to pay said draft for $7,900; or of the settlement made by said Stewart with said bank, or of the said settlement made by him with the Michigan State Bank; or of the collection by said Stewart of some part of the said securities so as aforesaid received by him from said River Raisin Bank, and of his substitution of the residue thereof for other property with the assent of said Phœnix Bank; or of the said deed of conveyance from

Stewart to the old Phenix Bank of the date of August 5, 1852; or of the said deed of settlement and release between said bank and Stewart of the date of August 5, 1852, were designed and intended to mislead the said board of State auditors as to the actual facts and merits of the case relating to said claim; and that such allegations were made and such omissions were practiced in the full belief that if the actual facts of the case, or such notice thereof as would lead to inquiry, should come to the knowledge of said board, the said claim would be rejected and disallowed as unfounded in justice or equity.

"There was no negligence on the part of the State of Michigan, or on the part of the members of the said board of State auditors, in not having obtained notice or knowledge before said claim was presented to, or while it was pending before, said board of the aforesaid acts and doings of said Stewart, with the assent of the old Phœnix Bank, in respect to the securities so as aforesaid received from said River Raisin Bank, on the said settlement had with such bank; or of the said two deeds of the date of August 5, 1852, or of either of them."

On the 9th of May, 1855, before the commencement of the present action, the State of Michigan, by the attorney-general of said State, demanded of the defendants in this action that they should pay and refund to said State the said sum of $35,603.74, with interest thereon from the 4th day of December, 1854, which the said defendants have refused to do, and the said defendants have not so refunded or paid to the said State any part thereof.

This brings us to the examination of the leading feature and most important point in this case, to wit: whether the obtaining of money from the State of Michigan upon a claim upon which there was no liability upon the State in equity and good conscience through the medium of one of the State tribunals acting judicially in the matter, by means of false and fraudulent allegations and representations, and of false and fraudulent omissions of facts, where the false allegations and representations so made, and the omissions so practiced,

were designed and intended to mislead the said tribunal as to the actual facts and merits of the case relating to said claim, and when such allegations and such omissions were practiced in the full belief by the party making and practicing the same that if the actual facts of the case, or such notice of them as would lead to inquiry should come to the knowledge of such tribunal, that the said claim would be rejected and disallowed as unfounded in justice or equity, can be recovered back from the party so obtaining it by such means?

Few more important questions than this, so far as it affects the great principles of justice and the character or the power of the judicial tribunals of this State, could be presented for our determination. I assume in this examination, as is claimed by the defendants, that this board of auditors of the State of Michigan, constituted as they were, to hear and decide controversies between the State and persons having claims against the State, legal or equitable, do exercise power in its nature judicially. Its powers were doubtless equivalent to that of a board of arbitrators, and its decisions, when made upon any question coming within its jurisdiction, are as conclusive as if made by any of the regularly constituted courts of the State. It may also be assumed that this tribunal had the sole and exclusive jurisdiction of all such claims. I think, too, it may be conceded as settled law, that money obtained from the State by a party litigant with the State before such a tribunal, upon its adjudication in his favor, could not be recovered back upon the mere ground that no sum was actually due in equity or good conscience, or that the board made their decision in ignorance of certain facts upon which, had they been proved, their decision would have been that there was nothing due. This case goes quite beyond that. The facts found by the judge establishes a case of active, designed and intended fraud on the part of the defendants, not only in the statements, allegations and representations made, but a designed and intended fraud in what was omitted to be stated, which in law amounts to fraudulent concealment. It was not merely innocent silence,

or omission to disclose, which may sometimes be without dishonesty, but it was active concealment, coupled with the intent that the State of Michigan, whose interest it was to know the facts known to the defendants, should remain ignorant of them with a view to the advantage of the defendants. This the law characterizes as fraudulent concealment. (*Carter* v. *Borhem*, 3 Burr., 1910.)

As a test of such notice and design, a single instance of each may suffice. One of the express statements made to this board by their agent, was, " that the Phœnix Bank has never been repaid a dollar to this day " (the day of trial). One of the material concealments was, the fact of the receipt at one time, of above $2,000 from the securities taken from the River Raisin Bank. It is impossible, in the nature of things, that this positive statement and this concealment can be innocent. No theory of innocence is suggested or offered as a defense for either; none is attempted. They stand, with the other features of fraud found, in their naked and odious deformity. These frauds are not even defended. The omissions to inform this board of the facts are attempted to be excused, on the ground that it was not the duty of the counsel of the defendants to disclose his knowledge and that of his clients, of facts against their interest, and the case is put on the ground that the decision of this board of auditors, being a judicial determination between the State of Michigan on the one part, and the Phœnix Bank on the other, is final in its nature, that it could not be reviewed, or in any way re-examined collaterally.

It is doubtless true that with respect to the regularity of that award or decision, or of any legal errors in obtaining it, that the Superior Court of New York could not take cognizance, nor exercise any appellate power, or power to review; and in any collateral attempt at law to impeach that decision, it must be regarded as binding and operative. But with relation to any fraudulent conduct of the parties in obtaining it, the court could take cognizance. That was a question legitimately within the province of the equitable power of the court, and constitutes one of the principal grounds of their

jurisdiction. The character of their proceeding in providing this decision is a fair subject to present to the scrutiny of a court of equity, and it is their duty, when duly probed, to determine its character as the ends of justice may require. (*Byers* v. *Surget*, 19 How. U. S., 308; *Munn* v. *Worral*, 16 Barb., 228.)

The question, then, is fairly presented for the judgment of this court, to wit, whether money received by one party from another, by means of a judgment, or other judicial proceeding, which was obtained through the fraud, falsehood and imposition of the party obtaining it, upon the tribunal by which it was adjudged, and where the money so obtained was paid before the discovery of the fraud by the party paying it, can be recovered back by the party from whom, through such means, it was obtained?

I am not aware of any case as yet, upon the decision of which the reproach has been cast upon the courts, for holding that the cunning or skill of the perpetrator of a fraud, or the form or solemnity of the means or instrument by which he obtains his unrighteous advantage, will shield him in the enjoyment of his ill-gotten gains. On the contrary the principle is living, pervading and universal, that good faith is the basis of all dealing. It was held in one of the opinions adopted by this court at the last March term, in the case of *The New York Exchange Company* v. *De Wolf*, that "whether "the means of fraud be oral or in writing, whether executed "by the parties with all the solemnities of deeds under seal, "and by due form of acknowledgment, or even by judgment "stamped by the judicial sanction of a court, if a party have "been induced to enter into the one, or to execute the other "by the fraudulent devices and designs of the party who thus "secures the advantage, the law, when invoked, declares the "whole transaction a nullity." In the case of *Galation* v. *Erwin and others* (Hopkins, 54), Chancellor SANFORD said, "that the most odious of all frauds was a fraud practiced upon a court of justice under the forms of law," and in that case he held a judgment of the Supreme Court void, for the fraudulent circumstances attending the proceedings in obtaining it.

In the case of *Loyd* v. *Munsell* (reported in 2 P. Wms., 74), the plaintiff brought a bill to redeem certain property, which the defendant claimed as having been obtained under a decree in his favor. It appeared that the defendant, before obtaining his said decree, procured a man to make a false affidavit that the defendant in this action was gone beyond sea, upon which the defendant got an order from the court, that a service on the then defendant's clerk in court be good service, whereas in fact the defendant was then living publicly in the next county town; but upon this false affidavit, and order made thereupon, the cause was heard *ex parte*, a report made *ex parte*, and confirmed absolutely, upon which decree the party so moving foreclosed, and the estate was obtained. The defendant (the party so obtaining this decree) set up in defense, in his plea, this decree of the court, and report both made absolute, signed and enrolled. The plaintiff's bill set forth these circumstances of fraud. The lord chancellor said, "all these circumstances of fraud ought to be answered, which so far from doing, the defendant only pleaded the decree and report in bar; and he added: "if these matters of fraud laid in the bill are true, it is most reasonable that the decree should be set aside," and the chancellor overruled the plea in bar. The defendant's counsel objected that a decree be set aside by an original bill; but his lordship replied, "such a gross fraud as this was an abuse on the court, and sufficient to set any decree aside."

The case of *Kennedy* v. *Daly*, decided by Lord Chancellor REDESDALE, of the high court of chancery in Ireland, reported in Schoales and Lefroy, 355, was in its features like the last above cited, where it was held "that a decree obtained by fraud and imposition shall have no effect." The lord chancellor, after stating the circumstances of fraud in obtaining the decree, said, "Now these proceedings, carried on under these circumstances, were a fraud on the court, and, in my opinion, they were a disgrace to all the parties concerned in them."

In the case of *Ives* v. *Metcalf* (reported in 1 Atkyns, 64), one of the points in the case was the validity of an award set

up in the action.  It was based upon certain articles, and was offered to be impeached by showing that the articles had never been shown to one of the arbitrators; and this arbitrator swore that he believed he should not have made such an award had he seen the articles.  Lord Chancellor HARDWICKE said, that as a general rule in cases of awards, as arbitrators are judges of the parties' own choosing, they cannot object to an award as against law, "but where, as in the present case, the arbitrators are deceived, or where they make their award clandestinely without hearing each party, in such cases a court of justice ought to interpose to frustrate and avoid such awards."  To the same effect in our own courts, is the case of *Van Cortland* v. *Underhill* (17 Johns., 405): SPENCER, Ch. J., said that the suppression and concealment of material facts by either of the parties, if it can reasonably be supposed that the knowledge of such facts by the arbitrators would have produced a different result, are causes for setting aside an award." (See also *Davis* v. *Tileston*, 6 How. U. S., 114; *Buckley* v. *Starr*, 2 Day, 552; *Fennimore* v. *United States*, 3 Dallas, 357.)  It is needless to multiply cases showing that the courts, upon bill filed, will set aside as a nullity, a judgment, decree or award obtained by fraud. (*Wilson* v. *Force*, 6 Johns., 110; *Jackson* v. *Haynor*, 12 id., 469; *Barber* v. *Kerr*, 3 Barb., 150; *Clark* v. *Underwood*, 17 id., 221; *Wright* v. *Miller*, 4 Seld., 9; *Weed* v. *Bentley*, 6 Hill, 56.) All contracts, instruments and securities and judgments thus obtained are nullities; the law looks upon them as if they never had existed; they can neither be justified nor sanctified on account of the form or character of the security.  The case of *Dobson* v. *Pearce* (2 Kern. [12 N. Y.], 156), and the numerous cases there cited, not only confirms the propositions above stated, but goes further, and holds that a court of equity has power to grant relief to the party injured.  If a court of equity was limited in its power to grant relief by its decree, to nullify or declare void only such judgments or other securities obtained by fraud, as had not been carried into effect, it would fail in one of its most valuable attributes.

It is not now claimed that the power of the court was so limited, or that power to grant relief in proper cases does not exist. Having equal cognizance with a court of law in the case, it being one of fraud, they were not restrained by want of power from granting due and proper relief. They found the facts constituting the fraud. Those facts stand here unreversed. They adjudged the fraud. Having obtained jurisdiction for that purpose, they retained it to administer complete relief. That relief is adjudged, and is expressed in the following language:

" The decision of the board of State auditors, made on the 2d of December, 1854, being contrary to law, equity, and good conscience; and having been procured by fraud practiced on behalf of the present defendants in the proceedings before said board in the prosecution of said claim, and the members of said board, and the State of Michigan, being then ignorant, without any fault or negligence on their part, of the existence of either of said two deeds of the date of August 5th, 1852, or of the collection of Stewart prior to the date last named of money upon some of the securities received by him from the River Raisin Bank, or of his substitution with the assent of the Phœnix Bank of the residue of such securities for other property; the said decision of the board of State auditors should be deemed to be and is null and void; and the plaintiffs are entitled to recover from the defendants the $35,603.74, which was paid by the former to the latter on the 4th of December, 1854, in pursuance and satisfaction of said decision, with interest thereon from the day last named until paid."

With the facts found in this case, standing unreversed — with active premeditated fraud so clearly established — unless courts can repudiate the sentiment that righteousness exalts the administration of justice, as well as it does a nation — such iniquity should receive its just condemnation when the aid of the courts are invoked by the injured party. Neither respect to the comity due to a sister State upon the one hand, nor local sympathy for an institution within our own, are con-

siderations worthy of a moment's thought. The unchanging and unalterable principles of justice must be the rule to determine this case.

The claim of the State of Michigan to recover back that part of the claim based on the amount settled by the River Raisin Bank with the Phœnix Bank is clear. The State of Michigan was never legally or equitably liable for that sum. That sum never came to the use of the State. The Phœnix Bank forbid its being paid. They received back, on settlement, the amount due to them by the rule of accord and satisfaction, and they realized in money and property the full amount, and under false pretenses they obtained and were paid the same amount over again. To this extent and for this amount the defendants must restore to the plaintiffs the money so obtained, with interest, and to this extent the judgment must be reversed or modified.

The amount of the draft advanced by the defendants on the Farmers' and Mechanics' Bank of Detroit actually came to the use of the State of Michigan, and was loaned upon the faith of representations of its public officers. The use of this money by the State may be regarded as a ratification of the act of its officers, and creates an equitable liability on the part of the State to make it good. The defendants only claim to hold in trust the property obtained on a settlement with the bank for this sum. They so claim in this action, and insist upon it in their argument to this court. They, of course, would be estopped from denying it hereafter. Though we have no power in this action to adjust that equity between the parties, if any loss shall be sustained on the property so held in trust, it is more equitable perhaps that the State of Michigan, who have had and used the money, should bear that loss than the defendants.

Upon the whole case, I am of opinion that the form of our judgment should be, in order to restore the parties to their rights, that the judgment be affirmed unless the plaintiffs, the State of Michigan, will remit so much of their judgment obtained on the trial as is equal to the draft on the Farmers' and Mechanics' Bank of Detroit, with interest, and if the

plaintiffs so remit that sum, then the judgment of the General Term of the Supreme Court be reversed.

A majority of the judges did not concur in all the views expressed in the foregoing opinion; but on other grounds, orally stated by DENIO, Ch. J., and PORTER, J., they all concurred with Judge POTTER in his conclusion as to the judgment to be rendered.