426        COURT OF COMMON PLEAS.

Brennan v. The Mayor, Aldermen and Commonalty of the City of New York.

MATTHEW T. BRENNAN, Appellant, *against* THE MAYOR, ALDERMEN AND COMMONALTY OF THE CITY OF NEW YORK, Respondents.

(Decided January 20th, 1880.)

An audit and allowance, or disallowance, by the board of supervisors, or board of apportionment and audit, of a claim against the county or city of New York, in a matter within its jurisdiction, is conclusive, and cannot be reopened or set aside by the courts, except for fraud ; but the board itself may reconsider the matter and if the audit was erroneous or improper correct it.

The strict rule which prevails where equitable aid is asked to relieve against a judgment obtained by fraud, that the fraud must have been extrinsic and collateral to the matter tried in the judgment does not apply to an audit obtained by fraud, because the injured party has not the same facilities to prevent injustice, that a party had against whom a judgment has been rendered.

An audit and allowance procured by fraud may be impeached in an action brought against the county to compel payment of the amount allowed, or in one brought to open such audit and allowance, whether the fraud was accomplished by means of false documents submitted to and passed upon by the board, or by means of the fraudulent suppression of facts in the proceedings before it, or where it is shown that the board knew that the claim was fraudulent and knowingly cooperated in the consummation of the fraud.

APPEAL from a judgment entered upon a verdict for defendant.

The facts are stated in the opinion.

*John H. Strahan* and *A. J. Vanderpoel*, for appellant.

*William C. Whitney* and *James C. Carter*, for respondents.

CHARLES P. DALY, Chief Justice.—This action was brought by the plaintiff to recover the amount of three several bills against the county, for services rendered by him as sheriff for the three-quarters of the year ending in the month

of September, 1872. The bills were audited and allowed by the board of supervisors in the mode prescribed by law, for the amount of $52,868 68. They were amongst other items, which are not disputed, for reporting convictions in the Courts of Oyer and Terminer, Courts of General Sessions, and the Police Courts of this city to the secretary of State, and for conveying prisoners to prison. The defense set up was, that a large portion of the charges for reporting convictions and conveying prisoners were for services that had never been performed ; that there were included in the bills, charges for moneys, alleged to have been paid by the plaintiff, which were not chargeable to the county ; but as no evidence was given to show this, it may be assumed that this defense was abandoned. And it was further set up, by way of counter-claim, that in the quarterly bills for the quarter ending March 31, 1871, to the quarter ending December 31, 1871, which were audited by the board of apportionment and audit, and paid by the county, there were included charges for reporting convictions to the secretary of State which were never reported, and for conveying a larger number of prisoners to prison than were actually conveyed by him, embracing charges improperly made, and improperly allowed, to a very large amount ($40,584 25) ; that the plaintiff falsely and fraudulently, knowing the same to be untrue, as well in respect to the audited bills, to recover which this action was brought, as for the bills which had been paid by the county in 1871, made affidavit when the bills were submitted for audit, either to the board of supervisors, or to the board of apportionment and audit, that they were just and true, and that the charges were for services actually performed by him, and the defendant claimed to recover back, in this action, the amount thus wrongfully obtained.

On the trial of the cause, the defendants, under the plaintiff's exception, were allowed to give evidence showing that a large amount was charged :—

1. For convictions, when no report of such convictions was, upon examination, found on file in the office of the secretary of State.

2. That convictions by Police Courts, which, in conformity with the statute, were included, and formed part of, the convictions in the Court of Special Sessions, were again charged for as convictions in the Police Courts ; and

3. For conveying prisoners to prison, when the service was performed by others who were paid for it; and

4. That where he had a right to convey, that he charged for a much larger number than were actually conveyed by him.

The jury, upon the whole evidence, disallowed a large amount of the claim for which this action was brought, and allowed a large portion of the counter-claim, rendering a verdict in favor of the defendants for $35,613 63, from which verdict and judgment the plaintiff has appealed.

As the bills previously paid to the plaintiff, and those for the recovery of which the action was brought, were all audited, either by the board of supervisors or the board of apportionment and audit, these respective bodies at the time of their action, having authority to adjust, settle and audit all claims against the county which are county charges, the first question presented is, whether the defendants had a right in this action to go behind the audit, and show that the services allowed for, and audited by these bodies, were never actually performed.

It is well settled that the action of the board of supervisors, and consequently of the board of apportionment and audit, in adjusting, settling, auditing and allowing claims against the county in matters within their jurisdiction is conclusive, and cannot be reopened or set aside by the courts, unless in a case of fraud. (*Brady* v. *Supervisors of N. Y.*, 2 Sandf. [S. C.] 460, on appeal; 10 N. Y. 260; *Martin* v. *Supervisors of Greene*, 29 Id. 647 ; *People, &c.*, v. *Green*, 52 Id. 224; *Board of Supervisors* v. *Ellis*, 39 Id. 626 ; *Knapp* v. *Huff*, 5 Id. 67 ; *National Bank, &c.*, v. *City of Elmira*, 53 Id. 53 ; *People, &c.*, v. *Supervisors of Courtland*, 58 Barb. 145; *People* v. *Stocking*, 50 Id. 573 ; *People* v. *Lawrence*, 6 Hill, 244; *Supervisors of Onondaga* v. *Briggs*, 2 Denio, 33, 34, 38 and 39.)

Their action is *quasi* judicial, as they exercise, in the matters within their jurisdiction, a discretion and judgment in allowing or disallowing a claim against the county. In all such matters their audit is conclusive, both against the claimant and the county, being the body specially designated by statute to whom all such claims must be presented, and which is clothed exclusively with authority to adjust, settle, and allow or disallow them. There is no mode provided by law for reviewing the exercise of this discretion, as the errors of courts of justice may be reviewed and corrected; at least, none that I am aware of. None has been pointed out in the elaborate briefs submitted in this case; and that there is none was assumed to be the fact in *Brady* v. *The Supervisors of New York* (2 Sandf. [S. C.] 472); *People* v. *Green* (56 N. Y. 469); *People* v. *Supervisors of Broome* (65 N. Y. 236). "The statute," says Chief Justice Oakley, in the first of these cases, "virtually makes the body a board of arbitration, to which all parties having claims" (which are county charges) "must submit their claim for examination, audit, and allowance; and it allows no appeal from their decision. They are a judicial body constituted by law to decide on all matters of account between individuals and the public body composing the county which they represent." "It is a power," says Johnson, J., in *People* v. *Green* (*supra*), "vested in the board of supervisors since 1788." This power, he says, is "exclusive of *all other authority* over the subject, to this extent, at least, that it is subject to no review;" and it was held, in *The People* v. *Supervisors of Queens* (1 Hill, 195), and in *The People* v. *Supervisors of Alleghany* (15 Wend. 198), that the Supreme Court would not, upon *certiorari*, assume to review the exercise of powers of this nature by the board of supervisors; and in *Mooers* v. *Smedley* (6 Johns. Ch. 28), that a court of equity would not and had never assumed to do so. If, however, they undertake to act in matters where they have no jurisdiction, as where they assume to audit claims which are not county charges, or which they are not empowered by statute to examine and allow, their proceedings are void, and of no effect, as was held in *People*

v. *Lawrence* (6 Hill, 244), and in many other cases. But an erroneous or improper audit by them is not wholly without remedy, for it has been held in *The People* v. *The Supervisors of Broome* (65 N. Y. 222), and also in *The People* v. *Stocking* (50 Barb. 573), that the board itself may, after an audit has been made, reconsider the matter, and if it was improper and erroneous, correct it. It had been previously held, in *The People* v. *Supervisors of Schenectady* (35 Barb. 408), in a special term case, upon a very full examination of the question, that the board of supervisors could not reconsider an apportionment of taxes made by them. The commissioners of appeal, in the case above referred to (*People* v. *Supervisors of Broome*), without expressing any opinion as to whether this decision was correct or not, distinguished it from the allowance or rejection by the board of supervisors, under a misconception of facts, of the claim of an individual against a county. In that case, an audit had been made by the board of supervisors of Broome allowing the relator $6300 for mustering nine men into the United States' service, for the county of Broome, who were credited to that county, which audit they afterwards reconsidered, and they disallowed the claim, upon the ground that the nine men had been transferred from Broome County and credited to Chemung County, where the bounty for them had been paid. This, the commissioners of appeal held, they had the power to do, and sustained the judgment given for the defendants in an action brought by the relator against the supervisors of Broome to compel the payment of the sum originally audited. It is claimed by the appellants that the courts have also the power to compel a further audit, and several cases are referred to which may possibly give some countenance to this view, but in none of them was it so determined, and the right to exercise such a power is, in my opinion, exceedingly doubtful, as it would be virtually assuming on the part of the courts to decide what the supervisors ought or ought not to do in matters which are exclusively within their jurisdiction.

Whilst courts have no right to interfere with the exercise

of the discretion and judgment of these boards in such matters, much less to attempt to control them, they may relieve against the effect of the audit, when it was obtained by fraud; a relief which they may, and which is especially proper to give, in an action brought against the municipality to compel the payment of the amount audited. It is an equitable power, more generally invoked to relieve against judgments obtained by fraud, and which, in the case of judgments, is cautiously exercised, and within limits that are tolerably well defined. As a general rule, in the case of judgments, the fraud must be extrinsic and collateral to the matter tried in the judgment, and not in matters given in evidence, and which were considered and passed upon by the court. Thus, it will not be exercised upon simply showing that witnesses upon the trial committed perjury, or that a material instrument given in evidence was fraudulent or forged (*U. S.* v. *Throckmorton,* 8 Otto, 66, 68 [98 U. S. R.] ; *Smith* v. *Lowry,* 1 John. C. 320; *Green* v. *Green,* 2 Gray, 361; *The Marine Ins. Co.* v. *Hodgson,* 7 Cranch, 332; *Simpson* v. *Hart,* 6 Id. 97 ; *Ib.,* 14 Johns. 77) ; for whatever injustice may be done in particular instances, by refusing to set aside judgments in such cases, the endless litigation that would be encouraged if courts should do so more freely would be infinitely worse ; it being an established maxim that it is to the interest of the commonwealth that there should be an end of litigation. *Interest rei publicæ ; ut set finis litium.* In the case of judgments, the exercise of the power is a very limited one, and very properly so, in view of the opportunity afforded in actions for full litigation; the right to review the judgment, if any error has been committed; to obtain another trial if material and decisive evidence is afterwards discovered, and from the facilities afforded by the court, in which the judgment was rendered, to set it aside, if obtained by fraud. For these reasons, equitable remedies to relieve against judgments are kept within very narrow bounds very much more so than when courts did not possess the ample power they do now to grant new trials, or to relieve against judgments upon motion. Thus, in a very few in

case, to which our attention has been called by the appellant (*The U. S.* v. *Throckmorton*, 8 Otto, [98 U. S.] 61), a general demurrer was sustained and judgment given for the defendant, in an equitable action brought to set aside a confirmation of a claim, under a Mexican grant of lands made by a board of commissioners of land claims, and a decree of a District Court of the United States, affirming the decree of the commissioners, upon the alleged ground that it had been ascertained that the final grant of the land by the proper Mexican official was signed when he was no longer in office, and fraudulently ante-dated, so as to purport upon its face to have been officially signed by him when in authority. This might be regarded as a very strict application of the rule by the judge who delivered the opinion of the court, were it not that the court founded their judgment also upon other grounds: (1) that it did not appear by the bill how the fraud had been ascertained or could be established; (2) that the allegation that the law agent of the government before the board of commissioners had notice of the fraudulent character of the grant, from papers in his possession, was not sustained by such a clear statement of the notice which he had as to establish that he had been negligent; (3) that the bill had not been filed till more than twenty years had elapsed from the making of the decree which it sought to annul; and (4) that it did not appear that the suit had been brought by or with the sanction of the attorney-general of the United States. Upon any one of which grounds the judgment of the court may, for all we know, have been rendered.

There is no sufficient reason, in my opinion, why so strict a rule should be applied in the case of an audit, where an action is brought to set it aside for fraud, or where relief is sought in an action brought to compel the payment of it, as the injured party has not the same facilities to prevent the wrong, or to repair it, when inflicted, that a party has against whom a judgment is rendered. In the case of an audit it makes no difference, in my opinion, whether the fraud was accomplished by means of the documents submitted to the

board, and passed upon by it, or by the intentional concealment of facts, which, if disclosed or known to it, would have led to a repudiation of the claim. In either case the effect is the same, and the representation made to the board, to satisfy it of the existence of the claim, is so necessarily coupled with the intentional concealment of the facts, which would show it to be unfounded, that both are but parts of the same thing,—the fraudulent scheme or plan to secure the audit of a claim which is fictitious. There is, therefore, no reason for such a rule in the case of an audit, as that fraud in the documents submitted, or in the representation made to the board, affords no ground for equitable relief, and that the inquiry must be limited to frauds extrinsic or collateral to what was before the board and passed upon by it.

This, I think, is fully established by the decision of the Court of Appeals in *The State of Michigan* v. *The Phœnix Bank* (33 N. Y. 9). In that case, the counsel and agent of the Phœnix Bank went before the board of State auditors of Michigan, and urged the payment of the claim of the bank for moneys loaned to former officials of the State without authority of law, but which, he insisted, the State was bound in honor to pay, as it had had the benefit of the money, stating that the bank had never received a dollar, and concealing from the auditors that the bank had been repaid a large amount of the claim; upon which representation the auditors allowed the whole claim of $35,603 74, which was paid by the State. The action, which was an equitable one, was brought by the State against the bank, to set aside the audit and to recover back from the bank the amount it had obtained upon the fraudulent representation of its agent, and judgment being given for the bank, it was affirmed by the Court of Appeals, except as to a certain amount which had gone to the use of the State, and had not been repaid to the bank.

It is very clear upon the authority of that case that if the plaintiff or his agent, the undersheriff, presented for audit to the board of supervisors, or to the board of apportionment and audit, claims for services which they, or either of

them, knew had never been performed, that the act was fraudulent, and that the audits to the extent of the amount thus fraudulently presented and allowed may be set aside; that there can be no recovery upon the bills audited in 1872 in respect to the charges, the auditing of which was fraudulently obtained; and that the amount paid by the county upon the audit of 1871, which on the part of the plaintiff or his agent, the undersheriff, was fraudulently obtained, may be recovered back, there being, if such were the facts in this case, as in *The State of Michigan* v. *The Phœnix Bank* (*supra*), a false and fraudulent representation of the existence of a claim which was fictitious.

The refusal of the court in this equitable action to compel the payments of the bills of 1872, to the extent that the audit of them was fraudulently obtained, and to give judgment for the payment by the plaintiff to the county of the amount received by him in 1871, to the extent that the audits of his bills in that year was fraudulently obtained, is in no way an interference with the judgment and discretion of the board of supervisors and the board of apportionment and audit, in matters of which they have exclusive jurisdiction; as the judgment of the court is founded upon facts disclosed in this action which were not before these boards, and which, it may be assumed, if known to them, would have prevented the audit of charges fraudulently made. Indeed, it may be said, so far as respects the equitable jurisdiction of the court, to relieve against an audit fraudulently obtained, that it would make no difference if the boards knew that these charges were fraudulent; for, if they did, and co-operated in the consummation of the fraud, the equitable power of the court could be exercised to relieve against it; for, as has been frequently said in the cases already referred to, fraud vitiates everything; and the court may interpose to prevent the consummation of one, or where it has been accomplished to compel restitution to the injured party, whether the fraud is practised by the official who presents a claim for audit, or by the official body whose duty it is to examine into it.

It may be said that the defendants have their remedy by

Brennan v. The Mayor, Aldermen and Commonalty of the City of New York.

applying to the board of supervisors to reconsider these audits, it being now settled by the court of last resort that the board of supervisors may do so.

But to this there are several answers.   The fact that the board of supervisors may reconsider and correct an erroneous audit does not deprive a court of equity of its power to give relief in cases of fraud; and if the board of supervisors should refuse to reconsider the matter, the party would still have his remedy in a court of equity, which may always be appealed to for relief in such cases; and having acquired jurisdiction by reason of the fraud, and having all the necessary parties before it, it may determine the whole matter and give complete relief.   (*State of Michigan* v. *The Phœnix Bank*, 33 N. Y. 28.)

A reconsideration, moreover, of the audits of 1871, would not restore to the defendants the money improperly obtained from them; and resort would still have to be had to an action to compel the restoration of it.   In addition to this, it was by no means certain, until the decision of the Court of Appeals in *The People* v. *The Supervisors of Broome (supra)*, that the supervisors could exercise such a power.   In fact, it was not only considered extremely doubtful, but it was decided in the case already referred to (*The People* v. *The Supervisors of Schenectady*, 35 Barb. 415) that they could not; that when they had exercised their judicial power, it was, in effect, a judgment which was final and conclusive as to any power they could exercise over it, by way of review or reversal, which conclusion was deduced from an examination and review of a number of cases that had previously been decided.   It may well have been, therefore, that the legal advisers of the municipality were of the opinion that these boards had no right to consider their previous action and pass again upon a claim which had been audited; that it was final and conclusive, as well upon the parties themselves as upon the official body that made it, especially as the decision of the Court of Appeals in *The People* v. *The Supervisors of Broome (supra)* that they could do so, was not rendered until a year after the plaintiff had brought this action to compel the payment of the bills audited in 1872.

It remains now to consider whether the evidence established that the audits, to the extent to which they were set aside by the judgment of the court below, were fraudulently obtained by the plaintiff.

As already stated, the plaintiff attached to each of his seven bills his affidavit that they were true, and for services actually rendered. He testified on the trial that he believed what he swore to in these affidavits to be true; that they were all made out by Stevens, the undersheriff, who was his book-keeper, in whom he had all confidence, as he, the plaintiff, was new to the office, and Stevens had been employed in it as a subordinate for many years previously. That he, the plaintiff, employed a person to obtain returns of the convictions in the courts, who brought the returns to the office; that the plaintiff did the best he could in examining to see if they were right, and then referred them to the undersheriff, Stevens, as he knew more about the duties of the office than the plaintiff did; that the bills were all made out by Stevens, and the plaintiff examined the returns, as far as he could, with the aid of Stevens, and satisfied himself as to the correctness of the charges; that he was satisfied that they were correct from the information that he obtained and the examination he made in respect to each of the bills that he presented; that he generally knew of the returns of the convictions of each day and referred them to Mr. Stevens; that he, the plaintiff, examined the bills before they were presented and understood the nature of the charges; that he believed that he had transferred to Blackwell's Island, the House of Refuge, and the Penitentiary, all the prisoners charged for; that he satisfied himself as to the charges, or never would have made them, but that he relied principally upon Stevens, as he was the book-keeper and made out the bills. Stevens testified that the charges for reports of convictions in the courts were made up by him from the data furnished by the deputies who collected the information; that the reports were sent to the secretary of State by the 10th of every month, though occasionally supplementary reports were made up and sent, as they could not get all the

information in time; that he did not forward the reports to the secretary of State in person, but that it was done by a clerk, and that he had not the remotest doubt but that they had all been forwarded; that entries were made of the conveyance of prisoners to the Penitentiary, the Workhouse, the Catholic Reformatory, the prison at Hart's Island, and other places, from information collected from the deputies who performed the services. That the bills were made up from the information received from the parties having the particular matters in charge—the cash items from the bills and receipts of the parties to whom the amounts were paid, and that nothing was charged in the bills that he had not, at the time, the true data for. It appeared, in addition to this, that the plaintiff's bills, when presented to the board of supervisors, were referred to a special committee; that this committee, or some members of it, went to the sheriff's office and examined the books and papers in reference to each bill; that instructions were given by the plaintiff to furnish them with all the information they required in making their investigation and examining into the correctness of the charges. And Stevens testified that this was done; that the data from which the bills were made up were placed before the committee; that nothing was concealed from them, and that, to the best of his belief, everything charged for was correct.

This would have been very satisfactory as presumptive evidence that all the charges were honestly and fairly made. It could not be expected that the head of a large office, like that of the sheriff of the city and county of New York, could personally know all the details of the services performed by all his numerous employees, and in verifying the correctness of his bills he would necessarily have to trust, more or less, to his subordinates; and also that the undersheriff would have to rely upon the subordinates who gave him information as to the number of prisoners conveyed or brought in formation as to the number of convictions. But this statement by the sheriff and undersheriff was met by an uncontradicted array of facts which showed that in the sheriff's bills a fraud had been practised to a very large amount;—

which established conclusively that, during this period of a year and nine months, charges were made for reporting convictions in the courts greatly exceeding the number of convictions, as was shown by the examination of the clerks of the respective courts and by comparing their statements with the reports made; that the reports of convictions in the Police Courts, which were, as Stevens testified, included under the head of special services, as provided for by the statute, were again charged for during the whole of this period under the head of convictions in the Police Courts. Stevens says that this charge under the head of Police Courts, in all the bills, was not for reporting convictions in these courts, but for collecting the statistical information to be reported. The short answer to this is, that the charges in all the bills were for reporting convictions in the Police Courts, the number of such convictions reported charged for in each bill being specifically enumerated, and not for collecting the statistical information. To state it more clearly, it is claimed that although charged in the bills as " for making reports of convictions in the Police Courts," the $12\frac{1}{2}$ cents charged was for collecting the information to enable the plaintiff to report the convictions. Stevens testified that this sum of $12\frac{1}{2}$ cents was allowed by a resolution of the board of supervisors; that that was the regular rule since 1867; in respect to which we have only his statement as to the resolution and the nature of it, no such resolution having been given in evidence. The answer to this statement is, that the statute does not authorize a county charge for collecting the statistics relating to convictions, and another county charge for reporting the same statistics to the secretary of State. It provides for what shall be reported, as the name, age, sex, native country of each person convicted, the degree of instruction and such other items of information as the secretary of State shall require, and that the reports shall be in such form as he may prescribe; and declares that for the sheriff's services in the premises, as well as for collecting statistics relating to convictions in the special sessions, he shall be allowed a reasonable compensation by the board of super-

visors.  The words "for their services in the *premises*," in the acts of 1861 and 1867, taken in connection with the previous act of 1839 (Laws of 1839, p. 234, §§ 4 and 5; Laws of 1861, p. 74, § 4; Laws of 1867, pp. 1631 and 1632, § 4), refer to the reporting of convictions in Criminal Courts of Record previously mentioned in section 4, both of the act of 1861 and of the act of 1867, and the words in these sections in both acts, "as well as for collecting statistics relating to convictions in Courts of Special Sessions," means that there shall be compensation as well for that service; the fifth section of the previous act of 1839 having provided that similar reports as in the Criminal Courts of Record should be made by the sheriffs of convictions in the Courts of Special Sessions, but omitted to make any provision for compensation for that service as the previous section (§ 4) in that act had done for the compensation of the sheriffs for reporting convictions in Criminal Courts of Record, and which the act of 1861, which was an amendatory and consolidating act, supplied.  The act of 1861 also provided afterwards in section 5 for the sheriff reporting convictions in the Special Sessions, but has nothing in that section about compensation for that service, having previously provided for it in the preceding section in the words, "for collecting statistics relating to convictions in Courts of Special Sessions."  As nothing is said in words in either of the acts about compensation for reporting convictions in Courts of Special Sessions, it follows that the county charge must be either for collecting statistics of such convictions, or for reporting the statistics, and cannot be for both as separate county charges.  If the county charge is to be for collecting statistics, then the 12½ cents allowed by the board of supervisors is all that the plaintiff would be entitled to, and he would not be entitled to 50 cents for each conviction reported.  But it is very plain, taking the statutes together, and construing them with reference to their general object, that it was the reporting of the convictions that was to be compensated and was to be a county charge, and if the board of supervisors, after fixing a county charge of 50 cents for that service, allowed in addi-

tion a separate county charge .of 12½ cents for collecting what was to be reported in respect to convictions in the Special Sessions, they had no authority under this statute to do so, and their audit of any such charge, under the decisions before referred to, may be disregarded as made without authority. No attempt was made in explanation of these charges to show that any statistical information, excepting that which was on file respecting these courts, was sent to the secretary, or that he ever required it, or that it had ever been required under the statute (Laws of 1839, pp. 235, 236). It appears that a deputy was employed to collect all the arrests made in these courts; but it is nowhere shown, nor pretended, that this was transmitted to the secretary of State as an account from month to month, of the arrests in these courts. It appeared by the testimony of Stevens himself, that no reports of convictions in the Police Courts, as such, were ever sent separately to Albany; but that in the monthly reports all such convictions were included as the statutes provides under the heads of "Convictions in the Special Sessions;" and it was proved by other testimony that no separate report of convictions in the Police Courts was ever filed in the office of the secretary of State. This evidence showed, either that the conviction already charged for under the head of "Convictions in the Special Sessions," were charged over again at the rate of 12½ cents each, under the head of "Convictions in the Police Courts," or that this unauthorized additional enumeration every quarter of convictions in the Police Courts was made up in some other way. That a fraud was practised by the plaintiff upon the county in the reporting of convictions is, I think, upon the evidence palpable, and it may have been done, as Stevens testified, and begun before the plaintiff came into office with the co-operation of the board of supervisors, under an administration of our municipal government that has since become notorious.

The fraud in reporting the convictions appears to have been two-fold: firstly, by charging for reporting a larger number than were actually convicted; and, secondly, by

making a wholly fictitious additional charge under the head of convictions in the Police Courts; and it is immaterial, whether this was done by Stevens with or without the plaintiff's knowledge and concurrence, as it was done for his benefit, and was a fraud upon the county. It was shown further, by uncontradicted evidence, that a large portion of the prisoners whose conveyance he charged for were never conveyed to prison by the sheriff or by any of his subordinates; but were transported by persons employed and paid by the commissioners of charities and corrections, or were in other cases brought from prison to the courts and back again by the ordinary court officers, who were officials paid by the city, and who performed this service as incident to their office.

I have carefully gone over the tabular statement of these overcharges, given in the respondent's points. I have compared it with the testimony of the witnesses and with the numerous exhibits. I have computed the amounts to test their correctness, and assuming, as the respondent does, that the plaintiff was entitled to charge only for conveying to prison persons convicted of crime in the Courts of Oyer and Terminer, the General Sessions, and the Court of Special Sessions, I find it to be substantially correct. There is some difference in my computation, but it is not material, at least as affecting the conclusions I have arrived at in this case.

The plaintiff charged, and was paid for reporting, in the year 1871, 39,771 convictions, which, at 50 cents each, is $19,985 50. The reports on file for every month, in the secretary of State's office, during that period, show that the number reported was 24,799, or 14,972 less than the plaintiff charged for; making an overcharge of $7,485, to which is to be added the additional fictitious charge in that year of 34,495 reports of convictions in the Police Courts, at $12\frac{1}{2}$ cents, making $4312, being altogether $11,797 fraudulently obtained during that year for this alleged service. It is suggested by the appellant that, as the examination was made in the secretary of State's office four years after the plaintiff's reports were sent, some of them may have been

mislaid, or may not have been preserved. But there is nothing in the evidence to warrant any such inference. The witness examined gave a tabular statement of the number of convictions reported in the Courts of Oyer and Terminer and General Sessions for every month during the whole of 1871, and for the nine months of 1872, and in the Special Sessions in 1872, showing that these reports were on file. The plaintiff sometimes made additional reports, being unable occasionally to get all the information of the preceding month, by the tenth of the following month, but there is no reason for inferring that the additional reports were not on file, or were missing or not preserved, any more than the regular reports, or that the witness did not draw the information of the number of reported convictions from both. He stated the reports that were not on file, which were the reports of the Special Sessions for 1871; but as they, or copies of them, were given in evidence on the trial, this information was supplied, and the whole showed the exact number of convictions reported during the whole period.

The plaintiff charged, and was paid for conveying in that year 23,050 prisoners to prison, which, at $1 75 each, the rate allowed by the board of supervisors, is $40,337 50. The number of persons convicted during that year in the Oyer and Terminer, the General Sessions and the Special Sessions was proved by the clerks of those courts. For those convicted and conveyed to the State Prison the plaintiff was not entitled to charge, as he is paid for that service by the State. The number who were convicted in these three courts, of every nature and description, who were sent to other prisons than the State Prison in 1871, was 3300, which includes those who were fined without imprisonment, as well as the cases in which judgment was suspended. The number who were only fined was 455, and the number who were sent to the city prison, no conveyance being required, the prison being connected by a bridge with the court room, were 210, which makes 665 who were not conveyed by the plaintiff to prison, and reduces the number convicted and

conveyed by him to 2,637; which, at $1 75 each, is $4,614 75. That this was the actual extent of the number of convicted persons conveyed by him appears by the testimony of the person who was employed by him to convey prisoners during the whole time the plaintiff was in office to the Penitentiary and House of Refuge, who testified that he conveyed every year for the plaintiff from 1600 to 2000, and that 2500 a year would be "a very outside statement." Deducting the $4617 50 for the conveyance during the year of 2637 convicted persons from the $40,337 50 charged by the plaintiff for this service, it shows that there was an overcharge by him in this item in 1871 of $35,722 75, which, added to the overcharge of $11,797 before referred to, in reporting convictions, makes a total overcharge during that year of $47,519 75.

In the three quarterly bills for the nine months of 1872 the plaintiff charges for conveying 18,081 prisoners, at $1 75 each, amounting to $31,641 75. There were convicted during that period, in the three courts before referred to, 2656, from which are to be deducted 376 fined without imprisonment, and 154 committed to the City Prison from the Special Sessions, where no conveyance was necessary, which would reduce the number conveyed by the plaintiff to 2410, for which the plaintiff was entitled to charge $4217 50, making an overcharge for this service in these bills of $27,424.

The plaintiff charged for reporting during this period 23,974 convictions, amounting to $11,987. It was shown that the number actually reported by him was 20,121, amounting to $10,060 50; making an overcharge of $1926 50. There is also, in these three bills, the fictitious charge, as in 1871, for reporting convictions in the Police Courts, which, in these bills, is 29,980 of such convictions, at 12½ cents each, amounting to $3747 51. The amount of these three bills is $52,868, deducting from which the three items of fictitious charges above referred to of $27,424 25, $1928 50 and $3747 51, reduces the amount of the plaintiff's claim in this suit to $19,770 49, against which is the counter claim

of $47,519 75. Deducting from the counter claim of $47,519 75 the amount to which the plaintiff was entitled, in the three quarterly bills of 1872, of $19,770 19, it brings the counter claim to $27,749 26, adding four years' interest to which brings the counter claim very near to the amount of the verdict rendered, which is $35,613 86.

In this computation, which is evidently the one upon which the jury acted, two items are not included : 1. The conveyance of juvenile delinquents to the House of Refuge, except where they were convicted in the Special Sessions, which was but a small proportion of the whole ; and 2. The conveyance of prisoners to court, and their reconveyance to prison, until their case was brought to trial, and they were either discharged or convicted. The plaintiff testifies that about thirty were brought every day to the General Sessions and the Oyer and Terminer, and those, of course, were remanded to prison whose trial was postponed, or where the day was occupied with the trial of others. The same prisoner, therefore, might be brought to court several days before his case could be tried, and in capital cases the accused were sometimes brought very often, the plaintiff testifying that in the case of Stokes, he was brought to the court at least forty times ; and that it was the same in another capital case—that of Cavanagh. For these conveyances of prisoners to court the plaintiff charged for each person and for each conveyance $1 75, which, if about thirty were brought a day, would be $52 50 a day ; and as the General Sessions sit 231 days in the year, that is, every day except Saturdays and Sundays and the last fortnights in July and August, and as the Oyer and Terminer has two terms in the year, of about forty days each, which would be altogether 311 days in the year, involving a charge each day for this service of $52 50, there would be a charge of about $16,437 50 for the year 1871, and for the nine months of 1872, $12,328 50, making altogether for this service during this period of a year and nine months, $28,766.

The defendants insist that the plaintiff was entitled to charge the county only for the conveyance of convicted per-

sons to prison in the final execution of their sentences. That the provision of the statute (1 R. S. 385, § 5), making the sheriff's compensation a county charge, is for his "services and expenses in conveying *criminals* to jail." If this were the only provision, there would be some ground for this objection, as the word "criminals" denotes those who have been convicted of crime, as contradistinguished from those who are merely charged with offenses, and who may be acquitted or convicted. But the statute, in the same section, also provides that the compensation of constables or *other officers*, for executing process on persons charged with criminal offences shall be a county charge, and this service, if performed by a sheriff, comes under this head. It is made the duty of the district-attorney of any county, by statute (2 R. S. 200, § 37), to issue a precept, twenty days before the sitting of the Court of Oyer and Terminer, to the sheriff to bring before the court all persons then in the jail of the county; and by the act of 1855 (chap. 337) all the provisions of law whatsoever, then existing, relating to Courts of Oyer and Terminer, and regarding trials of indictments for capital offences, and for offences punishable by imprisonment in the State prison for life, and regarding sentences thereon, &c., &c., are made applicable to the Court of General Sessions in this city. This provision may have been construed, whether correctly or not, as authorizing the district-attorney of this county to bring all persons in the city prison before the Court of General Sessions at each term of the court, as he is by the provisions in the Revised Statutes required to do, before the sitting of the Court of Oyer and Terminer. It appears by the plaintiff's testimony that he brought all the prisoners from the city prison to the General Sessions; that a list was given to him, by whom he does not state; and that he brought to the court the number he was instructed to bring. For all that appears in the evidence, it may have been a precept issued by the district-attorney from day to day, or before the beginning of each term, upon the construction that he was authorized to do so by the act before referred to, of 1855, applying existing provisions relat-

ing to the Court of Oyer and Terminer to the General Sessions of the county. However that may be, it appears by the plaintiff's own testimony, that before he came into office the prisoners were brought from the city prison to the Oyer and Terminer and General Sessions by the court officers, a class of officials, as I have said, who are paid by the city, and who performed this service necessarily as incident to the duty of their office. When prisoners were brought to these courts in charge of the court officers, which was done by having the prisoners handcuffed to a chain, the sheriff had no claim for compensation for a service which he did not perform, for what the statute provides is, that a reasonable compensation to constables or *other officers* executing process upon persons charged with crimes shall be a county charge, and if the constables, or, as they are now called, the officers of the court, brought each day the prisoners to the General Sessions that were to tried, there was no occasion for the board of supervisors making the service which these officers performed and were paid for, being salaried officers, which the sheriff is not, a county charge to be paid to the sheriff, and it may be that this charge of $1 75 to the sheriff, established by the board of supervisors, was, for all that we know, for the conveyance of convicted persons, in execution of their sentence, a service which the sheriff alone performed. What the provision of the board of supervisors was, in respect to this charge of $1 75 for conveying prisoners, does not appear, as the resolution of the board was not given in evidence. It merely appears to have been conceded that the supervisors allowed that specific sum for the conveyance of a prisoner. In the Special Sessions there was no conveyance of the prisoners by the sheriff, as the court room of the Special Sessions and the prison are in the same building, and the prisoners are brought into court and returned to the prison by the court officers across a bridge which connects the court room with the prison. It was admitted by the plaintiff, upon his examination, that there was no conveyance by him in these cases, and by his deputy Stevens, that no such conveyances were charged for. When the General

Brennan v. The Mayor, Aldermen and Commonalty of the City of New York.

Sessions was held in the same room where the Special Sessions is now held, which it was for many years, there was no conveyance of prisoners, as they were brought into the court room, and returned to prison in the same way, across the bridge; but when the General Sessions was removed to the present building in the park, the prisoners to be tried had to be brought to it from the city prison, and were brought, as before stated, handcuffed to a chain by the court officers.

Shortly after the plaintiff came into office, he got a wagon or van built in which to convey the prisoners from the city prison to the court rooms of the General Sessions and Oyer and Terminer, charging the county with the cost of the van and of the horses, for which he was paid in 1871, and he also charged in his quarterly bills for the keeping of the horses. He employed the driver of the van and the person who guarded it, and for conveying the prisoners in the van a distance of four blocks, or at farthest a quarter of a mile, he charged $1 75 for each conveyance of a prisoner. In this way, he says, " I relieved the court officers, and relieved the prisoners from walking, by putting them in the van," by which relief he put upon the county an additional annual expenditure, for his own benefit, of $16,437 50, his only outlay being the payment of the driver and the guard of the van. As incidental to his coming into office, therefore, he took upon himself the performance of a service previously discharged by paid officials of the county, at an increased cost to the county of over $16,000 annually.

Whether he was entitled to do this would depend upon whether the act of 1855 required the district-attorney to issue a precept twenty days before the sitting of the General Sessions, which is nearly constantly in session throughout the year, to bring before it all the persons in jail every month at the beginning of each term, which I very much doubt; and if it did, whether the district-attorney issued any such precept, which, by statute, is to be tested and sealed as process of the court; which must state, by the provisions of the statute, the time and place of holding the court, which,

as respects the sitting of the Oyer and Terminer, is neces-
sary, but wholly unnecessary in respect to the sitting of the
General Sessions in this county, the holding of the terms of
which court is regularly fixed and established by law ; and
finally, whether the provision made by the board of $1 75
for conveying prisoners by the sheriff, and making it a county
charge, did or did not embrace a conveyance of this descrip-
tion. There can be no doubt of the plaintiff's right to charge
for conveying prisoners to the Court of Oyer and Terminer,
under the precept from the district-attorney; but the num-
ber so conveyed was necessarily small. The clerk of the
Oyer and Terminer testified that the convictions in that
court relatively " were very few," being " generally," he said,
" cases of homicide " that " do not count up," making the
number of accused persons brought into that court for trial
exceedingly limited, when compared with the number
brought for trial before the General Sessions.

Even allowing the plaintiff to recover for this service to
the extent which he stated it, and at the rate charged by
him, the overcharge remained still very great; to account
for which the plaintiff said that he charged $1 75 for every
person committed to the City Prison, without reference to
the question whether he conveyed the prisoners or not ; that
whenever a person was committed to the City Prison he
charged this fee, no matter how the prisoner got there;
whether sent from the Police Courts on a conviction for ten
days, or for trial at the Special or General Sessions ; that he
went upon the ground that he had a right to charge for con-
veying him, whether he conveyed him or not ; and that he
never employed any person to convey such prisoners, and
had never expended a dollar for that service. The prisoners
were conveyed from the Police Courts by the policemen who
attended these courts, or by the person employed by the com-
missioners of charities and correction, who convey prisoners
from these courts in a van to the City Prison for short im-
prisonment, or to the punitory establishments under the con-
trol of the commissioners. The plaintiff's statement, upon
his examination, was that he charged $1 75 for the convey-

ance of each person committed in the Police Courts, although he had nothing to do with the conveyance of these prisoners. These convictions are the summary convictions that are made in these courts in cases of vagrancy, intemperance, disorderly conduct, and offenses of this nature, which, as the record shows, constitutes the great bulk of convictions for criminal offenses in this city.

A single illustration from the records which form part of the exhibits in this case will show how greatly they outnumber all other convictions. In the report of the convictions made to the secretary of State, by the plaintiff, for the month of July, 1872, in the Court of Special Sessions and in the Police Courts, which are all included under one head, the whole number of convictions are stated to have been 1676, of which 1482 were convictions for vagrancy, drunkenness and disorderly conduct, and for all other offenses 192. For the conveyance of all the persons convicted in these Police Courts, although, as before stated, made by other officials and paid for by the county, the plaintiff charged $1 75 for each conveyance.

For this charge there was not even a pretense. The statute before referred to (1 R. S. 385) declares that the compensation to be allowed to constables and *other* officers for services and expenses in conveying criminals to jail shall be a county charge. We have no longer, in this city and county, as we formerly had, constables, who were compensated for their services by fees regulated by law, but in their stead a class of officials known in the administration of the criminal laws by the title of policemen, who receive no fees, but, as compensation for their services, have a fixed salary, which is paid out of the public treasury, and where this class of officers convey criminals, as they may do, to prison, their compensation for this service is fixed as a county charge, by the yearly salary that is paid to them by the county. In the case of the Police Courts, they are the officers, in the language of the statute, " conveying criminals to jail," who, and not the sheriff, are entitled under it to compensation, as a county charge, and who receive it in the fixed salary that is

paid to them. And where, upon conviction in these courts for vagrancy, drunkenness, or disorderly conduct, prisoners, under the statutes regulating the powers and duties of, and providing for the funds to be expended by, the commissioners of charities and correction, are conveyed to the establishments under the direction of the commissioners, the service is performed in the manner provided for by them, and is paid for by them, and is a county charge. And yet, for this conveyance of over 18,000 persons yearly by the commissioners, which was paid for out of the city treasury, the plaintiff claimed that he had a right to charge the county $1 75 for the conveyance of each person, amounting to at least $30,000 a year, and had this fictitious claim audited in his bills under a general charge of " conveying prisoners to prison other than the State prisons "—an imposition upon the county which it is unnecessary to characterize in words; and as respects the plaintiff, this was knowingly and intentionally done, for he employed the same person to carry his own prisoners that was employed by the commissioners to convey the prisoners convicted in the Police Courts to the punitory establishments under their charge, this official of the commissioners receiving a salary from them for the carriage of the prisoners convicted in the Police Courts, and for conveying to the Penitentiary and the House of Refuge the prisoners convicted in the Oyer and Terminer and the General and Special Sessions, he had with the plaintiff a distinct agreement, who paid him regularly for this service, and took his receipts for the number conveyed for him, which, by the testimony of this official, amounted to about 2000 a year. I say that this charge for conveying 18,000 persons convicted in the Police Courts every year, with which the plaintiff had nothing whatever to do, was knowingly made, for this matter of the conveyance of prisoners was a service with which he was personally very familiar, independent of his office of sheriff, his testimony on this point being as follows: " I had been in the business a good while, you know, as captain of the police and police justice ; I knew the routine."

The number of juvenile delinquents convicted in the

Special Sessions, and which are included in the computation previously referred to, amounted in 1871 to 33, and during nine months of 1872 to 19, or, in all, 42. It was proved by the superintendent of the House of Refuge that the number of juvenile delinquents received in that establishment in 1871 was 263, and for the nine months of 1872 was 176, the whole during this period being 439. Deducting the 33 already allowed for in 1871, there remains 230 for the conveyance of which the plaintiff is entitled to charge, and deducting in the same way the 19 allowed for in 1872, it leaves 157, which the plaintiff is entitled to charge for in that year, or altogether 387 not allowed for in the previous computation, which, at $1 75 for each conveyance, amounts to $677 25. This amount the plaintiff was entitled to. He was also entitled to recover for conveying prisoners to the Court of Oyer and Terminer for trial, and, for all that appears in the case, may have been entitled for conveying prisoners to the General Sessions for trial. Taking his own estimate of the number he brought each day to these two courts, which, as before stated, would for a year and nine months entitle him to $28,766, and adding to that the $677 25 which he was further entitled to for the conveyance of juvenile delinquents, the whole would amount to $29,443 25, and if the whole of this amount is allowed him, adding to the bills of 1871 the proportional amount he would be entitled to, and doing the same in respect to the bills of 1872, and allowing interest on the amount in 1871 which the defendants would be entitled to recover back, and allowing him interest on the whole amount he was entitled to in the bills of 1872, from the time of their audit on the 26th of December, 1872, it will show, without the necessity of my putting down the details of the computation, that the amount which the plaintiff improperly obtained from the county in 1871 is greater than the amount to which he is lawfully entitled upon the bills of 1872, upon which he has brought this suit, and that under no view of the case is he entitled to recover anything in this action. If the corporation counsel, therefore, feels authorized to remit the amount which the defendants have recov-

ered upon their counterclaim, we could, and, in my opinion, should affirm the judgment, to the extent that the plaintiff was not entitled to recover anything in this action, or if not, there should be a new trial, as the recovery of a counter-claim against the plaintiff to the extent of $35,613 63 cannot be sustained upon the evidence.

The whole amount that he received in 1871, as well as the amount he claims to recover in this action, has been audited, and the audit is conclusive upon the defendants, except so far as it is impeached, and may be set aside on the ground of fraud. The plaintiff's evidence is that about $30,000 of the amount audited was for services rendered in bringing persons to court for trial, and for the conveyance of juvenile delinquents. If this, or any part of it, is to be rejected, it can be so only upon proof that there was no foundation whatever for any such claim, and that the auditing it was fraudulently obtained by the plaintiff, or by those acting for him. The proof does not show this, but on the contrary, that he is undoubtedly entitled to a part of it; and possibly, for all that we know, may be entitled to the whole.

The plaintiff's counsel raise the objection in these points that there was no averment in that part of the answer setting up the counterclaim that the plaintiff charged for reporting more convictions than there were in the Oyer and Terminer, General Sessions and Special Sessions. No such objection as this was raised on the trial. The proof of the actual number of convictions in the Oyer and Terminer and General Sessions was received without any objection. When the clerk of the Special Sessions was called, the defendant's counsel said, " All of this evidence (none then having been given) comes in under our objection and exception, as to its relevancy and competency, except as to form. It all presents the same question, and comes in under your Honor's ruling." There is nothing in the case showing that there had been any previous ruling, except as to the proof of what was presented to the board of supervisors for the audit. It does not appear, therefore, to what this very general excep-

tion, before the clerk of the Special Sessions was asked a question, referred, unless it was the subsequent proof of the number of convictions in the Special Sessions. It is not necessary to discuss the objectionable nature of a general exception like this, when a witness is called, and before any inquiry is put to him, as it is sufficient to say, that the evidence as to the actual number of convictions in the Special Sessions was admissible, as the police convictions and those in the Special Sessions are all enumerated in the reports under the head of convictions in the Special Sessions, and proof of how many were convicted in the Special Sessions was proper and necessary to distinguish how many police convictions were included under that head, as evidence explanatory, and tending to show the fraudulent nature of the additional charge in the bills for reporting police convictions which were never reported. There are no other exceptions in the case, except such as seem to have been made to exclude any evidence given to impeach the audit for fraud, which it is unnecessary to pass upon, as they are sufficiently disposed of in what has been previously said in respect to the law upon this subject.

In conclusion, a judgment for the defendant should be affirmed if the counsel of the corporation consents to remit the counterclaim, and if not, a new trial should be ordered.

JOSEPH F. DALY, J., concurred.

The counsel of the corporation therefore filed a consent remitting the counter claim, upon which an order was entered affirming the judgment as a judgment for the defendant.